BEAM, Circuit Judge.
This case is before us en banc upon remand from the United States Supreme Court. We briefly outline what has occurred in this matter since its inception, believing that it will be helpful in analyzing the issues presented.
The dispute commenced in the United States District Court for the District of Minnesota. At issue were the so called “announce,” “partisan-activities,” and “solicitation” clauses of Canon 5 of the Minnesota Supreme Court’s canons of judicial conduct. The district court rejected Appellants’ First and Fourteenth Amendment claims, Republican Party of Minn. v. Kelly, 63 F.Supp.2d 967 (D.Minn.1999), and granted summary judgment to Appellees: the Minnesota Board on Judicial Standards, the Minnesota Lawyers Professional Responsibility Board, and the Minnesota Office of Lawyers Professional Responsibility. Id. at 986. On appeal, a divided panel of this court affirmed the district court. Republican Party of Minn. v. Kelly, 247 F.3d 854 (8th Cir.2001). We denied Appellants’ en banc suggestion. The Supreme Court granted certiorari and held, Republican Party of Minn. v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), that the announce clause violates the First Amendment, reversing our holding in Kelly. The Court remanded the case for further proceedings consistent with its opinion. Id. at 788, 122 S.Ct. 2528. Upon remand, the same panel, divided as before, again affirmed the district court’s ruling on the solicitation clause and remanded for further consideration in light of White of the partisan-activities clause. Republican Party of Minn. v. White, 361 F.3d 1035 (8th Cir.2004) (vacated). We granted Appellants’ request for en banc review, vacating the panel opinion. Today, we find that the partisan-activities and solicitation clauses also violate the First Amendment. Accordingly, we reverse the district court and remand the case with instructions to enter summary judgment in favor of Appellants.
The Supreme Court’s remand requires us to consider two issues in light of White: the constitutional viability of the partisan-activities and solicitation clauses of Canon *745 5.[1]
In doing so, we give no deference to earlier panel opinions.
[L]egal propositions which an appellate court settles on appeal ordinarily cannot be questioned again, .... A corollary to [this principle] is the rule that, upon a reversal and remand for further consistent proceedings, the case goes back ... for a new determination of the issues presented as though they had not been determined before, pursuant to the legal principles enunciated in the appellate court’s opinion, which must be taken as the law of the case.
Poletti v. C.I.R., 351 F.2d 345, 347 (8th Cir.1965). Thus, our task is to take the “legal principles enunciated in” White and apply them to the partisan-activities and solicitation clauses for a determination of these claims “as though they had not been determined before.” Id. And that is what we have done.
I. BACKGROUND
Canon 5A(1) and 5B(1), the partisan-activities clause, and B(2), the solicitation clause, rein in the political speech and association of judicial candidates in Minnesota. The partisan-activities.clause states, in relevant part:
Except as authorized in Section 5B(1), a judge or a candidate for election to judicial office shall not:
(a) identify themselves as members of a political organization, except as necessary to vote in an election;
(d) attend political gatherings; or seek, accept or use endorsements from a political organization.
52 Minn.Stat. Ann., Code of Judicial Conduct, Canon 5, subd. A(l)(a), (d). Section 5B(l)(a) provides that “[a] judge or a candidate for election to judicial office may ... speak to gatherings, other than political organization gatherings, on his or her own behalf.”[2] Id. at subd. B(l)(a) (emphasis added). The solicitation clause states,
A candidate shall not personally solicit or accept campaign contributions or personally solicit publicly stated support. A candidate may, however, establish committees to conduct campaigns for the candidate through media advertisements, brochures, mailings, candidate forums and other means not prohibited by law. Such committees may solicit and accept campaign contributions, manage the expenditure of funds for the candidate’s campaign and obtain public statements of support for his or her candidacy. Such committees are not prohibited from soliciting and accepting campaign contributions and public support from lawyers, but shall not seek, accept or use political organization endorsements. Such committees shall not disclose to the candidate the identity of campaign contributors nor shall the committee disclose to the candidate the identity of those who were solicited for contribution or stated public support and refused such solicitation. A candidate shall not use or permit the use of campaign contributions for the private benefit of the candidate or others.
Id. at subd. B(2).[3]
*746 The facts of this case demonstrate the extent to which these provisions chill, even kill, political speech and associational rights. In his 1996 bid for a seat as an associate justice of the Minnesota Supreme Court, appellant Gregory Wersal (and others working on his behalf) identified himself as a member of the Republican Party of Minnesota, attended and spoke at the party’s gatherings, sought the endorsement of the party, and personally solicited campaign contributions. In response to Wersal’s appearance at and speech to a Republican Party gathering, a complaint was filed with the Minnesota Lawyers Professional Responsibility Board, alleging that Wersal’s actions violated Canon 5A(l)(d). Although the Minnesota Office of Lawyers Professional Responsibility (OLPR) ultimately dismissed the complaint, the complaint accomplished its chilling effect. Wersal, fearful that other complaints might jeopardize his opportunity to practice law, withdrew from the race.
Wersal made a second bid for a seat on the Minnesota Supreme Court in 1998. In 1997 and 1998, Wersal asked the OLPR for advisory opinions regarding the solicitation and partisan-activities clauses. The OLPR’s response was mixed, stating it would not issue an opinion regarding personal solicitation, in light of proposed amendments to the Canon and the fact that there were no judicial elections scheduled that particular year. It also stated that it would enforce the partisan-activities clause. Wersal then initiated this litigation. In the meantime, he was forced to write several letters to individuals who had indicated they would speak on his behalf at Republican Party conventions across the state, asking them not to do so in order to avoid violating Canon 5 and imploring them to “[pjlease be patient. I hope for a decision from the Federal Courts soon.” He also had his campaign’s legal counsel advise the chairman of the Republican Party of Minnesota that Canon 5 would prohibit Wersal from accepting or using any endorsement from the party. There is no question that Wersal sought to work within the confines of Canon 5 even as he sought to challenge it-confines that in the most direct of ways restricted his political speech and association, compelling him at one point to end a political campaign.
II. DISCUSSION
A. Judicial Selection in Minnesota
Minnesota has chosen to elect the judges of its courts. Minn. Const, art. 6, § 7. “The fundamental law of this state is, and always has been, that the selection of judges must be submitted to the electors .... ” State ex rel. La Jesse v. Meisinger, 258 Minn. 297, 103 N.W.2d 864, 866 (1960). Some thirty-three states employ some form of contested election for their trial courts of general jurisdiction, their appellate courts, or both. American Judicature Society, Judicial Selection in the States: Appellate and General Jurisdiction Courts (Jan.2004). As federal judges, we confess some bias in favor of a system for the appointment of judges. Indeed, there is much to be said for appointing judges instead of electing them, perhaps the chief reason being the avoidance of potential conflict between the selection process and *747 core constitutional protections. In promoting the newly drafted United States Constitution, Hamilton argued in Federalist No. 78 that if the people were to choose judges through either an election or a process whereby electors chosen by the people would select them, the judges would harbor “too great a disposition to consult popularity to justify a reliance that nothing would be consulted but the Constitution and the laws.” The Federalist No. 78, at 439 (Alexander Hamilton) (Clinton Rossjter ed., 1961). Arguably, concerns about judicial independence and partisan influence, posited by Minnesota as grounds for regulating judicial election speech, are generated, fundamentally, not by the exercise of political speech or association, but by concerns surrounding the uninhibited, robust and wide-open processes often involved in the election of judges in the first place. As Justice O’Connor noted in her White concurrence, “the very practice of electing judges undermines [an]' interest” in an actual and perceived impartial judiciary. 536 U.S. at 788, 122 S.Ct. 2528.
Yet, there is obvious merit in a state’s deciding to elect its judges, especially those judges who serve on its appellate courts. It is a common notion that while the legislative and executive branches under our system of separated powers make and enforce public policy, it is the unique role of the judicial branch to interpret, and be quite apart from making that policy.
But the reality is that “[t]he policymak-ing nature of appellate courts is clear.” Michael R. Dimino, Pay No Attention To That Man Behind the Robe: Judicial Elections, The First Amendment, and Judges as Politicians, 21 Yale L. & Pol’y Rev. 301, 364 (2003) (citing Henry R. Glick, Policy Making and State Supreme Courts, in The American Courts: A Critical Assessment 87 (John B. Gates & Charles A. Johnson eds., 1991)); Stephen J. Ware, Money, Politics and Judicial Decisions: A Case Study of Arbitration Law in Alabama, 30 Cap. U.L.Rev. 583, 594 (2002) (“[It ■ is a] myth that courts are apolitical and do not make policy. The Legal Realists exploded that myth and showed that judges do make policy. This is especially true of judges on states’ highest courts.”). Courts must often fill gaps created by legislation. And in particular, by virtue of what state appellate courts are called upon to do in the scheme of state government, they find themselves as a matter of course in a position to establish policy for the state and her citizens. “At the [state] appellate level, common-law functions such as the adoption of a comparative fault standard, or the determination of a forced spousal share of intestate property distribution, require a judiciary that is sensitive to the views of state citizens.” Kathryn Abrams, Relationships of Representation in Voting Rights Act Jurisprudence, 71 Tex. L.Rev. 1409, 1425 (1993). The courts’ policy-making power is, of course, ever subject to the power of the legislature to enact statutes that override such policy. But that in no way diminishes the reality that courts are involved in the policy process to an extent that makes election of judges a reasonable alternative to appointment.
Without question, Minnesota may choose (and has repeatedly chosen) to elect its appellate judges. The very nature of its sovereignty within our federal system guarantees that. “[A] crucial axiom of our [federal form of] government [is that] the States have wide authority to set up their state and local governments as they wish.” McMillian v. Monroe County, Ala., 520 U.S. 781, 795, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). Indeed, “[t]hrough the structure of its government ... a State defines itself as a sovereign.” Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Of course, that power of state self-determination is not boundless. “[It is *748 an] axiom that, under our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject ... to limitations imposed by the Supremacy Clause.” Id. at 457, 111 S.Ct. 2395. The Supremacy Clause provides that the Constitution, and laws and treaties made pursuant to it, are the supreme law of the land. U.S. Const, art. VI, cl. 2. When a state engineers its governmental structure or processes in a way that curtails liberties guaranteed by the Constitution, that presumption of state self-determination is replaced, in this case, by a careful-even critical-judicial inquiry fashioned by the particular liberty at issue. If Minnesota sees fit to elect its judges, which it does, it must do so using a process that passes constitutional muster.
B. The First Amendment and Political Speech
Within this context, Minnesota has enacted Canon 5 in an effort to regulate judicial elections. In White, the Court held the announce clause of Canon 5, which prohibits judicial candidates from stating their views on disputed legal issues, unconstitutional. It falls to us now to determine whether the partisan-activities and solicitation clauses of Canon 5 are acceptable under the First Amendment.
The First Amendment commands that “Congress shall make no law ... abridging the freedom of speech.” U.S. Const, amend. I. Freedom of association is inherently a part of those liberties protected by the First Amendment. See Buckley v. Valeo, 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (“The First Amendment protects political association as well as political expression.”). If it were not so, many of the Amendment’s guarantees would ring hollow.
An individual’s freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed .... Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.
Roberts v. United States Jaycees, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (citation omitted). The due process clause of the Fourteenth Amendment makes the First Amendment applicable to the states. McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).
Protection of political speech is the very stuff of the First Amendment. “ ‘[I]t can hardly be doubted that the constitutional guarantee [of the freedom of speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.’ ” Buckley, 424 U.S. at 15, 96 S.Ct. 612 (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)). That is because our constitutional form of government not only was borne of the great struggle to secure such freedoms as political speech, but also because such freedom helps assure the continuance of that constitutional government. “In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation.” Id. at 14-15, 96 S.Ct. 612.
It cannot be disputed that Canon 5’s restrictions on party identification, speech to political organizations, and solicitation of campaign funds directly limit judicial candidates’ political speech. Its restrictions *749 on attending political gatherings and seeking, accepting, or using a political organization’s endorsement clearly limit a judicial candidate’s right to associate with a group in the electorate that shares common political beliefs and aims.
C. The Strict Scrutiny Framework
Political speech-speech at the core of the First Amendment-is highly protected. Although not beyond restraint, strict scrutiny is applied to any regulation that would curtail it. McIntyre, 514 U.S. at 347, 115 S.Ct. 1511. The strict scrutiny test requires the state to show that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest.[4] Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989); United States v. Playboy Entm’t Group, Inc., 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (“When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.”). Strict scrutiny is an exacting inquiry, such that “it is the rare case in which ... a law survives strict scrutiny.” Burson v. Freeman, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992).
1. The Requirement of a Compelling State Interest
Precisely what constitutes a “compelling interest” is not easily defined. Attempts at definition generally use alternative, equally superlative language: “interest[] of the highest order,” “overriding state interest,” “unusually important interest.” Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); McIntyre, 514 U.S. at 347, 115 S.Ct. 1511 (1995); Goldman v. Weinberger, 475 U.S. 503, 530, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (O’Connor, J., dissenting); see David Crump, The Narrow Tailoring Issue in the Affirmative Action Cases: Reconsidering the Supreme Court’s Approval in Gratz and Grutter of Race-Based Decisiorir-Making by Individualized Discretion, 56 Fla. L.Rev. 483, 498 (2004) (“The concept of a compelling governmental interest is deceptively self-evident. Its own words define it. It is an interest that is compelling, or extremely important, or of the ‘first order.’ ”). And “[n]owhere in the text of the Constitution, or in its plain implications, is there any guide for determining what is a ‘legitimate’ state interest, [compelling or otherwise].” Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 181, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (Rehnquist, J., dissenting). In addition, *750 few of the Court’s cases explain what makes a state interest “compelling.” But some general guides can be deduced from what the Court has said. Some opinions have found an interest compelling based on policy grounds.[5] Others have found a basis in “the realization of constitutional guarantees.” See Stephen E. Gottlieb, Compelling Governmental Interests: An Essential But Unanalyzed Term in Constitutional Adjudication, 68 B.U. L.Rev. 917, 932-37 (1988) (collecting cases).
In general, strict scrutiny is best described as an end-and-means • test that asks whether the state’s purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest. As one commentator has said, “the Court’s treatment of governmental interests has become largely intuitive, a kind of ‘know it when I see it’, approach.” Id. at 937. Such an analysis requires, first, a clear understanding of what the state’s interest may be. “Clarity on this point is essential before we can decide whether [the purported , interest] is indeed a compelling state interest .... ” White, 536 U.S. at 775, 122 S.Ct. 2528.
The inquiry of whether the interest (the end) is “important enough”-that is, sufficiently compelling to abridge core constitutional rights-is informed by an examination of the regulation (the means) purportedly addressing that end. A clear indicator of the degree to which an interest is “compelling” is the tightness of the fit between the regulation and the purported interest: where the regulation fails to address significant influences that impact the purported interest, it usually. flushes- out the fact that the interest does not rise to the level of being “compelling.” If an interest is compelling enough to justify abridging core constitutional rights, a state will enact regulations that substantially protect that interest from similarly significant threats. As expressed in White: “ ‘[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon ... speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.’ ” Id. at 780, 122 S.Ct. 2528 (first alteration in original) (quoting The Florida Star v. B.J.F., 491 U.S. 524, 541-42, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (Scalia, J., concurring)).[6] Accord City of Ladue v. Gilleo, 512 U.S. 43, 52-53, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (“Exemptions from an otherwise legitimate regulation of a medium of speech ... may diminish the credibility of the government’s rationale for restricting speech in the first place.”); Florida Star, 491 U.S. at 540, 109 S.Ct. 2603 (“[T]hé facial underinclusiveness [of a speech regulation] raises serious doubts about whether [the state] is, in fact, serving ... the significant interests [it articulates].”); Carey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (finding purported interest in residential privacy not truly compelling where a picketing statute prohibited peaceful picketing in general, but not peaceful labor pieket- *751 ing, in residential neighborhoods); Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 67 n. 27, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (“If some groups are exempted from a prohibition [purported to uphold a state interest], the rationale for regulation is fatally impeached.”) (quotation omitted).
2. The Need for Narrow Tailoring
Once a state interest is found to be sufficiently compelling, the regulation addressing that interest must be narrowly tailored to serve that interest. Eu, 489 U.S. at 222, 109 S.Ct. 1013. As with the compelling interest determination, whether or not a regulation is narrowly tailored is evidenced by factors of relatedness between the regulation and the stated governmental interest. A narrowly tailored regulation is one that actually advances the state’s interest (is necessary), does not sweep too broadly (is not overin-clusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative). See id. at 226, 228-29, 109 S.Ct. 1013 (evaluating the degree to which the regulation in question advanced the stated interest at all); Buckley, 424 U.S. at 45-47, 96 S.Ct. 612 (same); Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 122 n. *, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (stating that a regulation is not narrowly tailored if it is overinclusive); Florida Star, 491 U.S. at 540, 109 S.Ct. 2603 (holding that the underinclusiveness of a statute raises “serious doubts” about whether the statute actually serves the state’s purported interest); Rutan v. Republican Party of Ill., 497 U.S. 62, 74, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (finding that a less restrictive means was available to advance the state’s interest); FEC v. Mass. Citizens for Life, Inc., 479 U.S. 238, 262, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (same); Florida Star, 491 U.S. at 538, 109 S.Ct. 2603 (same); Eugene Volokh, Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny, 144 U. Pa. L.Rev. 2417 (collecting cases). In short, the seriousness with which the regulation of core political speech is viewed under the First Amendment requires such regulation to be as precisely tailored as possible.
D. Minnesota’s Purported Compelling State Interest
In Kelly, Minnesota argued that Canon 5’s restrictions on judicial candidate speech served a compelling state interest in maintaining the independence, and the impartiality, of the state’s judiciary. Minnesota continues to argue that judicial independence, as applied to the issues in this case, springs from the need for impartial judges. Apparently, the idea is that a judge must be independent of and free from outside influences in order to remain impartial and to be so perceived. Thus, in Kelly, the panel majority understood the two notions, independence and impartiality, to be interchangeable,[7] as the Supreme Court promptly noted in White, 536 U.S. at 775 *753 n. 6, 122 S.Ct. 2528. In Kelly, the panel majority analyzed the announce, partisan-activities, and solicitation clauses in light of impartiality as a compelling interest, but failed to define “impartiality.” On appeal, the Supreme Court filled that void by fleshing out its meaning. Justice Scalia reasoned that impartiality in the judicial context has three potential meanings.
One possible meaning of “impartiality” is a “lack of preconception in favor of or against a particular legal view.” Id. at 777, 122 S.Ct. 2528. Quickly discounting this uncommon use of the word, the Court said it could not be a compelling interest for a judge to “lack ... predisposition regarding the relevant legal issues in a case” because such a requirement “has never been thought a necessary component of equal justice.” Id. The Court reasoned, first, that it is “virtually impossible” to find a judge who lacks any “preconceptions about the law,” and second, that it would not be desirable to have such a judge on the bench. Id. “Proof that a Justice’s mind at the time he joined the Court was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias.” Id. at 778, 122 S.Ct. 2528 (quotation omitted). We follow the Court’s direction and likewise dismiss the idea that this meaning of impartiality could be a compelling state interest.
A second possible meaning is a “lack of bias for or against either party to [a] proceeding.” Id. at 775, 122 S.Ct. 2528. Calling this the traditional understanding of “impartiality” and the meaning used by Minnesota and amici in their due process arguments, the Court explained that this notion “guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party.” Id. at 776, 122 S.Ct. 2528. The Court implied, and we find it to be substantially evident, that this meaning of impartiality describes a state interest that is compelling. It can hardly be argued that seeking to uphold a constitutional protection, such as due process, is not per se a compelling state interest. See, e.g., Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 311-315, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (recognizing the First Amendment as a basis for a compelling state interest).- And the rule laid down in Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), makes clear that the partiality of a judge as it relates to a party to a case violates due process protections: “[I]t certainly violates the Fourteenth Amendment, and deprives [a person] of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case.” Id. at 523, 47 S.Ct. 437. In Bracy v. Gramley, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997), the Court reiterated that “the floor established by the Due - Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case.” Id. at 904-05, 117 S.Ct. 1793 (quotation and citation omitted). See also Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821-25, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (citing Tumey ); Ward v. Monroeville, 409 U.S. 57, 58-62, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (same); Johnson v. Mississippi, 403 U.S. 212, 215-16, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971) (per curiam) (holding that due process was violated where a judge presided in a case involving a party who had successfully sued him earlier. “Trial before ‘an unbiased judge’ is essential to due process.”); In re Murchison, 349 U.S. 133, 137-39, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (holding that due process was violated by a judge presiding over both the indictment, under a special “judge-grand jury” proce *754 dure in Michigan, and trial of a criminal defendant).
Being convinced that protecting litigants from biased judges is a compelling state interest, we turn to the “narrow tailoring” examination of the partisan-activities clause under this particular meaning of judicial impartiality. Because this meaning directs our attention to parties to the litigation rather than to ideas and issues, we analyze the regulation in this context before turning to other possible definitions of impartiality. We consider whether the partisan-activities clause actually addresses this compelling state interest and, if so, whether it is the least restrictive means of doing so.
In White, the Supreme Court found that the announce clause failed the narrow tailoring aspect of the strict scrutiny test, holding “[i]ndeed, the clause is barely tailored to serve that [lack of bias] interest at all, inasmuch as it does not restrict speech for or against particular parties, but rather speech for or against particular issues.” White, 536 U.S. at 776, 122 S.Ct. 2528. Thus, the Court found that clause was not narrowly tailored because it failed to advance a compelling interest. The same is true for the partisan-activities clause.
1. Unbiased Judges and the Narrow Tailoring of the Partisan-Activities Clause
In one sense, the underlying rationale for the partisan-activities clause-that associating with a particular group will destroy a judge’s impartiality-differs only in form from that which purportedly supports the announce clause-that expressing one’s self on particular issues will destroy a judge’s impartiality. Canon 5, in relevant part, forbids a judicial candidate from identifying with a political organization, making speeches to a political organization, or accepting endorsements from or even attending meetings of a political organization, all of which are the quintessence of political associational activity. And beyond its importance in bringing about those rights textually protected by the First Amendment, association, as earlier noted, is itself an important form of speech, particularly in the political arena. See, e.g., Boy Scouts of Am. v. Dale, 530 U.S. 640, 655-56, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (holding that the Boy Scouts had a First Amendment right to send a particular message based on the individuals it allowed to be associated with the organization as scoutmasters); Eu, 489 U.S. at 223, 109 S.Ct. 1013 (“[T]he First Amendment has its fullest and most urgent application to speech ... during a campaign for political office.”) (quotation omitted). Indeed, Minnesota argues that a party label is nothing more than shorthand for the views a judicial candidate holds. Br. of Appellee The Hon. Charles Flinn, Jr. at 30. Inasmuch, then, as the partisan-activities clause seeks, at least in part, to keep judges from aligning with particular views on issues by keeping them from aligning with a particular political party, the clause is likewise “barely tailored” to affect any interest in impartiality toward parties. Thus, the Supreme Court’s analysis of the announce clause under this meaning of “impartiality,” to wit judicial bias, is squarely applicable to the partisan-activities clause.
To be sure, when a case arises that turns on a legal issue on which the judge (as a candidate) had taken a particular stand, [be that through announcing or aligning with particular views,] the party taking the opposite stand is likely to lose. But not because of any bias against that party, or favoritism toward the other party. Any party taking that position is just as likely to lose. The *755 judge is applying the law' (as he sees it) evenhandedly.
White, 536 U.S. at 776-77, 122 S.Ct. 2528.
We recognize that the difference between the direct expression of views under the announce clause and expressing a viewpoint under the partisan-activities clause through association, is that the latter requires the aligning of one’s self with other like-minded individuals-that is, the members of a political party.
Political parties are, of course, potential litigants, as they are in this case. Thus, in a case where a political party comes before a judge who has substantially associated himself or herself with that same party, a question could conceivably arise about the potential for bias in favor of that litigant. Yet even then, any credible claim of bias would have to flow from something more than the bare fact that the judge had associated with that political party. That is because the associational activities restricted by Canon 5 are, as we have pointed out, part-and-parcel of a candidate’s speech for or against particular issues embraced by the political party. And such restrictions, we have also said, do not serve the due process rights of parties. In the case of a political party involved in a redistricting dispute, for example, the fact that the matter comes before a judge who is associated with the Republican or Democratic Party would not implicate concerns of bias for or against that party unless the judge were in some way involved in the case beyond simply having an “R” or “D,” or “DFL” (denoting Minnesota’s Democratic-Farmer-Labor Party) after his or her name. See Minn. State Bar Ass’n v. Divorce Educ. Assocs., 300 Minn. 323, 219 N.W.2d 920, 922 (1974) (holding that in civil action brought by state bar association seeking injunction against individuals for unauthorized practice of law, membership in the same bar association would not in itself disqualify a judge from hearing the case on a theory the judge was “impliedly biased”). Thus, the partisan-activities clause does not advance an interest in impartiality toward litigants in a case where, without more, it is a like-minded political party which is one of the litigants.
And in those political cases where a judge is more personally involved, such as where the redistricting case is a dispute about how to draw that judge’s district, and even in those cases discussed above that merely involve a political party as a litigant, recusal is the least restrictive means of accomplishing the state’s interest in impartiality articulated as a lack of bias for or against parties to the case. Through recusal, the same concerns of bias or the appearance of bias that Minnesota seeks to alleviate through the partisan-activities clause are thoroughly addressed without “burning] the house to roast the pig.” Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957). Indeed, Canon 3 of the Minnesota Code of Judicial Conduct provides that a judge is to “disqualify himself or herself in a proceeding in which the judge’s impartiality might reasonably be questioned.” 52 Minn.Stat. Ann., Code of Judicial Conduct, Canon 3, subd. D(l). Section (a) of the statute in particular addresses Minnesota’s goals, providing that a judge should recuse himself where “the judge has a personal bias or prejudice concerning a party.” Concern about the mere appearance of bias is also addressed by recusal. See In re Collection of Delinquent Real Prop. Taxes, 530 N.W.2d 200, 206 (Minn.1995) (holding that “[t]he controlling principle is that no judge ... ought ever to [hear] the cause of any citizen, even though he be entirely free from bias in fact, if circumstances have arisen which give a bona fide appearance of bias to litigants.”).
Therefore, the partisan-activities clause is barely tailored at all to serve any inter *756 est in unbiased judges, and, at least, is not the least-restrictive means of doing so. Accordingly, it is not narrowly tailored to any such interest and fails under strict scrutiny.
2. Impartiality Understood as “Openmindedness,” and the Partisan-Activities Clause
The third possible meaning of “impartiality” articulated by the Supreme Court in White, and the one around which its analysis of the announce clause revolved, was “described as openmindedness.” White, 536 U.S. at 778, 122 S.Ct. 2528. The Court explained,
This quality in a judge demands, not that he have no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case. This sort of impartiality seeks to guarantee each litigant, not an equal chance to win the legal points in the case, but at least some chance of doing so.
Id. The Court stopped short, however, of determining whether impartiality articulated as “openmindedness” was a compelling state interest because it found that, even if it were, the “woeful[ ] underinclu-sive[ness]” of the clause betrayed any intended purpose of upholding openmindedness. Id. at 780, 122 S.Ct. 2528.
We conclude that the partisan-activities clause is likewise “woefully underinclu-sive,” calling into question its validity in at least two ways. First, it leads us to conclude, before even reaching a compelling interest inquiry, that like the announce clause, the partisan-activities clause was not adopted for the purpose of protecting judicial openmindedness. Second, under a compelling interest analysis, the clause’s underinclusiveness causes us to doubt that the interest it purportedly serves is sufficiently compelling to abridge core First Amendment rights. We conclude that the underinclusiveness of the partisan-activities clause causes it to fail strict scrutiny.[8]
*757 a. Underinclusiveness Belies Purported Purpose
Underinclusiveness in a regulation may-reveal that motives entirely inconsistent with the stated interest actually lie behind its enactment. See id. at 779, 122 S.Ct. 2528 (noting that the underinclusiveness of the announce clause “is quite incompatible with the notion that the need for open-mindedness ... lies behind the prohibition at issue here”); City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (stating, in an equal protection case, “[ijndeed, the purpose of strict scrutiny is to ‘smoke out’ illegitimate [purposes] .... The test also ensures that the means chosen ‘fit’ this compelling goal so closely that there is little or no possibility that the motive for the classification was [something inconsistent with the interest].”); City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (finding that the underinclusiveness of a zoning regulation betrayed the city’s purported interests in, inter alia, not locating housing in a flood plain, not being legally responsible for the actions of its occupants, assuring adequate square footage per occupant, and lessening residential and street congestion); First Nat’l Bank of Boston v. Bellotti, 435 U.S. 765, 793, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (finding that the underinclusiveness of a regulation “undermines the likelihood of a genuine state interest” in the purported goal). In White, the Court found that, “as a means of pursuing the objective of openmindedness ... the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous.” White, 536 U.S. at 780, 122 S.Ct. 2528. The underinclusiveness manifests itself in the inherently brief period of speech regulation during a political campaign relative to the many other instances in which a judicial candidate, especially an incumbent who is a candidate, has an opportunity to speak on disputed issues. The Court reasoned that if the purpose of the announce clause were truly to assure the openmind-edness of judges, Minnesota would not try *758 to address it through a regulation that restricted speech only during a campaign since candidates’ views on contentious legal issues can be and are aired in the many speeches, class lectures, articles, books, or even court opinions given or authored before, during or after any campaign.
The same is true of the partisan-activities clause. The announce clause bars a judicial candidate from stating his views on disputed issues though “he may say the very same thing ... up until the very day before he declares himself a candidate.” Id. at 779, 122 S.Ct. 2528. The partisan-activities clause bars a judicial candidate from associative activities with a political party during a campaign, though he may have been a life-long, active member of a political party (even accepting partisan endorsements for nonjudicial offices) up until the day he begins his run for a judicial seat. A regulation requiring a candidate to sweep under the rug his overt association with a political party for a few months during a judicial campaign, after a lifetime of commitment to that party, is similarly underinclusive in the purported pursuit of an interest in judicial open-mindedness. The few months a candidate is ostensibly purged of his association with a political party can hardly be expected to suddenly open the mind of a candidate who has engaged in years of prior political activity. And, history indicates it will be rare that a judicial candidate for a seat on the Minnesota Supreme Court will not have had some prior, substantive, political association. In sum, restricting association with a political party only during a judicial campaign, in supposed pursuit of judicial open-mindedness, renders the partisan-activities clause “so woefully underinclusive as to render belief in that purpose a challenge to the credulous.” Id. at 780, 122 S.Ct. 2528.
As for the appearance of impartiality, the partisan-activities clause seems even less tailored than the announce clause to an interest in open-mindedness. While partisan activity may be an indirect indicator of potential views on issues, an affirmative enunciation of views during an election campaign more directly communicates a candidate’s beliefs. If, as the Supreme Court has declared, a candidate may speak about her views on disputed issues, what appearance of “impartiality” is protected by keeping a candidate from simply associating with a party that espouses the same or similar positions on the subjects about which she has spoken? Moreover, even if there Were some system in' which it would make sense to allow one but not the other in pursuit of the same goal, cabining a candidate from a political party for the relatively short duration of a campaign would add nothing to an appearance of impartiality. Given this “woeful underin-clusiveness” of the partisan-activities clause, it is apparent that advancing judicial open-mindedness is not the purpose that “lies behind the prohibition at issue here.”[9] Id. at 779, 122 S.Ct. 2528.
*759 b. Underinclusiveness Betrays “Compelling” Claim
While it is not necessary for us to reach the question of whether judicial open-mindedness as defined in White is sufficiently compelling to abridge core First Amendment rights, we note that the underinclusiveness of Canon 5’s partisan activities clause clearly establishes that the. answer would be no. Whether Minnesota asserts a compelling state interest in judicial open-mindedness is substantially informed by the fit between the partisan-activities clause and the purported interest at stake. A clear indicator of the compelling nature of an interest is whether the state has bothered to enact a regulation that guards the interest from all significant threats.
We are guided on remand by the law enunciated in White, and the Court’s words bear repeating: “[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.” Id. at 780, 122 S.Ct. 2528 (quotation omitted). By its own terms, Canon 5’s restrictions on association with “political organizations” apply only to “assoeiation[s] of individuals under whose name a candidate files for partisan office”-political parties. 52 Minn.Stat. Ann., Code of Judicial Conduct, Canon 5, subd. D. Yet, if mere association with an organization whose purpose is to advance political and social goals gives Minnesota sufficient grounds to restrict judicial candidates’ activities, it makes little sense for the state to restrict such activity only with political parties. There are numerous other organizations whose purpose is to work at advancing any number of similar goals, often in a more determined way than a political party. Minnesota worries that a judicial candidate’s consorting with a political party will damage that individual’s impartiality or appearance of impartiality as a judge, apparently because she is seen as aligning herself with that party’s policies or procedural goals. But that would be no less so when a judge as a judicial candidate aligns herself with the constitutional, legislative, public policy and procedural beliefs of organizations such as the National Rifle Association (NRA), the National Organization for Women (NOW), the Christian Coalition, the NAACP, the AFL-CIO, or any number of other political interest groups. While Minnesota expresses doubt that the influence an interest group can have over a candidate is comparable to that of a political party, the record in this case refutes the premise.[10] Indeed, *760 associating with an interest group, which by design is usually more narrowly focused on particular issues, conveys a much stronger message of alignment with particular political views and outcomes. A judicial candidate’s stand, for example, on the importance of the right to keep and bear arms may not be obvious from her choice of political party. But, there can be little doubt about her views if she is a member of or endorsed by the NRA. Yet Canon 5 is completely devoid of any restriction on a judicial candidate attending or speaking to a gathering of an interest -group; identifying herself as a member of an interest group; or seeking, accepting, or using an endorsement from an interest group. As a result, the partisan-activities clause unavoidably leaves appreciable damage to the supposedly vital interest of judicial openmindedness unprohibited, and thus Minnesota’s argument that it protects an interest of the highest order fails.[11]
c. Underinclusiveness Not Indicative of a Legitimate Policy Choice
The panel majority in Kelly did not find the underinclusiveness of the partisan-activities clause troublesome. It viewed it as a legitimate policy choice: “when underinclusiveness results from a choice to address a greater threat before a lesser, it does not run afoul of the First Amendment.” Kelly, 247 F.3d at 872. Association with political parties, goes the argument, is a greater threat to judicial openmindedness than association with interest groups because political parties have more power “to hold a candidate in thrall.”[12] Id. at 876. But to determine *761 whether Minnesota has shown that association with political parties poses a greater menace to judicial open-mindedness than association with other political interest groups, it is necessary to do at least some analysis of the two supposed threats. While the opinion in Kelly purports to examine the “threat” posed by political parties, it contains no discussion of any comparable danger advanced by association with special interest groups, despite ample record evidence that suggests the influence of these special groups is at least as great as any posed by political parties.[13]
Minnesota has simply not met its heavy burden of showing that association with a political party is so much greater a threat than similar association with interest *762 groups, at least with evidence sufficient for the drawing of a constitutionally valid line between them. As a result, cases granting some degree of deference to legislatures who seek to attack one form of a problem before addressing another form are not applicable here. See Erznoznik v. City of Jacksonville, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (relying on Williamson v. Lee Optical Inc., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955)).
To the contrary “the notion that a regulation of speech may be impermissibly underinclusive is firmly grounded in basic First Amendment principles.” Ladue, 512 U.S. at 51, 114 S.Ct. 2038. While the Court in Erznoznik stated in dictum that underinclusive classifications may be upheld, “on the sound theory that a legislature may deal with one part of a problem without addressing all of it,” it was quick to add that “[t]his presumption of statutory validity, however, ... has less force when a classification turns on the subject matter of expression.” Erznoznik, 422 U.S. at 215, 95 S.Ct. 2268. Just as the Court did in Erznoznik, we reject the argument that the underinclusive regulation is valid. “‘[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.’ ” Id. (quoting Police Dep’t of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)). As we have noted, political association is speech in and of itself. It allows a person to convey a message about some of his or her basic beliefs through such associations. See, e.g., Boy Scouts of Am., 530 U.S. at 655-56, 120 S.Ct. 2446. Even if we were to believe that the partisan-activities clause regulates political parties and not interest groups because political parties somehow pose a greater “threat” by having a louder and more comprehensive voice, such a distinction would still turn, at least in part, on the content of the message each seeks to convey. Under such a rationale, it is the subject matter of the messages that is at stake-with political parties usually, but not always, emitting a variety of propositions and interest groups often advancing a more narrowly focused agenda. Such line-drawing based on the subject matter of expression is what the Court in Erznoznik considered suspect. Erznoz-nik, particularly, discredits any argument that the Minnesota Supreme Court is justified in dealing with one part of the perceived subject matter problem, and not all of it.
In Kelly, the majority relied upon Lee Optical for the proposition that a legislature “may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.” 348 U.S. at 489, 75 S.Ct. 461. But Lee Optical turned on a determination that the “Equal Protection Clause goes no further than [prohibiting] invidious discrimination.” Id. Thus, Lee Optical’s underinclusiveness dealt with a matter of degree in a regulation that did not invoke strict scrutiny because the regulation did not implicate a fundamental right or a suspect classification. But underinclusiveness in this free speech case questions the very premise that Minnesota is seeking to address a compelling interest. Quite apart from addressing itself to any “phase” of a particular problem, Minnesota seeks to regulate different sources of the same so-called “problem” based exclusively on whether or not groups are registered as Minnesota political parties. In Burson, the Court held that Tennessee’s failure to restrict charitable and commercial solicitation or exit polling, in addition to campaigning, within 100 feet of polling places did not render the statute “fatally underinclusive” because the evidence in the case did not show that such charitable and commercial solicitation influenced the state’s *763 interest of preventing fraud at polling places. 504 U.S. at 207, 112 S.Ct. 1846. In stating that “[sjtates adopt laws to address the problems that confront them” and “[t]he First Amendment does not require States to regulate for problems that do not exist,” the Court concluded that there was “simply no evidence that political candidates have used other forms of solicitation or exit polling to commit ... electoral abuses.” Id. By contrast, as discussed above, the evidence in this case, and common sense, show that association with political interest groups poses the same threat, if any real threat actually exists at all, to judicial open-mindedness as that posed by political parties. This, coupled with the Court’s view in White that “[a] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohi-bited,” compels us to find that the underin-clusiveness of the partisan-activities clause is not indicative of a legitimate policy choiee on the part of Minnesota. White, 536 U.S. at 780, 122 S.Ct. 2528 (quotation omitted).[14]
3. The Solicitation Clause
We now turn to an analysis of portions of the solicitation clause. The solicitation clause bars judicial candidates from personally soliciting individuals or even large gatherings for campaign contributions. “In effect, candidates are completely chilled from speaking to potential contributors and endorsers about their potential contributions and endorsements.” Weaver v. Bonner, 309 F.3d 1312, 1322 (11th Cir.2002). And as the majority conceded in Kelly, such restriction depends wholly upon the subject matter of the speech for its invocation. 247 F.3d at 863. Judicial candidates are not barred from personally requesting funds for any purpose other than when it is “related to a political campaign.” Burson, 504 U.S. at 197, 112 S.Ct. 1846. Restricting speech based on its subject matter triggers the same. strict scrutiny as does restricting *764 core political speech. “ ‘The First Amendment’s hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire [subject].’ ” Carey, 447 U.S. at 462, n. 6, 100 S.Ct. 2286 (quoting Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm’n, 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980)).
Moreover, the very nature of the speech that the solicitation clause affects invokes strict scrutiny. This is because the clause applies to requests for funds to be used in promoting a political message. It bears repeating that “ ‘[i]t can hardly be doubted that the constitutional guarantee [of the freedom of speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.’ ” Buckley, 424 U.S. at 15, 96 S.Ct. 612 (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)). And promoting a political message requires the expenditure of funds.
[V]irtually every means of communicating ideas in today’s mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate’s increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.
Id. at 19, 96 S.Ct. 612. As Justice O’Con-nor stated in her White concurrence, “[u]nless the pool of judicial candidates is limited to those wealthy enough to independently fund their campaigns, a limitation unrelated to judicial skill, the cost of campaigning requires judicial candidates to engage in fundraising.” 536 U.S. at 789-90, 122 S.Ct. 2528 (O’Connor, J., concurring). Insofar as the solicitation clause restricts the amount of funds a judicial candidate is able to expend on his or her political message, the regulation is of the same caliber as that struck down in Buckley.
Since strict scrutiny is clearly invoked, the solicitation clause must also be narrowly tailored to serve a compelling state, interest. Minnesota asserts that keeping judicial candidates from personally soliciting campaign funds serves its interest in an impartial judiciary by preventing any undue influence flowing from financial support. We must determine whether the regulation actually advances an interest in non-biased or open-minded judges.[15] Appellants challenge only the fact that they cannot solicit contributions from large groups and cannot, through their campaign committees, transmit solicitation messages above their personal sig *765 natures. They do hot challenge the campaign committee system that Canon 5 provides under which candidates may establish committees that may solicit campaign funds on behalf of the candidate. “Such committees shall not disclose to the candidate the identity of campaign contributors nor shall the committee disclose to the candidate the identity of those who were solicited for contribution or stated public support and refused such solicitation.” 52 Minn.Stat. Ann., Code of Judicial Conduct, Canon 5, subd. B(2).
a. Unbiased Judges and the Narrow Tailoring of the Solicitation Clause
We first consider whether the solicitation clause serves an interest in impartiality articulated as a lack of bias for or against a party to a case. Keeping candidates, who may be elected judges, from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest in impartiality as to parties to a particular case. It seems unlikely, however, that a judicial candidate, if elected, would be a “judge [who] has a direct, personal, substantial, pecuniary interest in reaching a conclusion [for or] against [a litigant in a case],” Tumey, 273 U.S. at 523, based on whether that litigant had contributed to the judge’s campaign. That is because Canon 5 provides specifically that all contributions are to be made to the candidate’s committee, and the committee “shall not” disclose to the candidate those who either contributed or rebuffed a solicitation. 52 Minn.Stat. Ann., Code of Judicial Conduct, Canon 5, subd. B(2). Thus, just as was true with the announce clause and its fit with an interest in unbiased judges, the contested portions of the solicitation clause are barely tailored at all to serve that end. An actual or mechanical reproduction of a candidate’s signature on a contribution letter will not magically endow him or her with a power to divine, first, to whom that letter was sent, and second, whether that person contributed to the campaign or balked at the request.[16] In the same vein, a candidate would be even less able to trace the source of funds contributed in response to a request transmitted to large assemblies of voters. So, the solicitation clause’s pro *766 scriptions against a candidate personally-signing a solicitation letter or making a blanket solicitation to a large group, does not advance any interest in impartiality articulated as a lack of bias for or against a party to a case.
b. Open-minded Judges and the Narrow Tailoring of the Solicitation Clause
We next consider whether the solicitation clause as applied by Minnesota serves an interest in impartiality articulated as “open-mindedness.” Put another way, would allowing a judicial candidate to personally sign outgoing solicitation letters, or to ask a large audience to support particular views through their financial contributions, in some way damage that judge’s “willing[ness] to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case”? White, 536 U.S. at 778, 122 S.Ct. 2528. We think not. Given that Canon 5 prevents a candidate from knowing the identity of contributors or even non-contributors, to believe so would be a “challenge to the credulous.” Id. at 780, 122 S.Ct. 2528. Thus, Minnesota’s solicitation clause seems barely tailored to in any way affect the open-mindedness of a judge. Accordingly, the solicitation clause, as applied by Minnesota, cannot pass strict scrutiny when applied to a state interest in impartiality articulated as open-mindedness.
III. CONCLUSION
In White, the Supreme Court invalidated the announce clause and remanded the case to this court. Upon further consideration of the partisan-activities and solicitation clauses in light of White, we hold that they likewise do not survive strict scrutiny and thus violate the First Amendment. We therefore reverse the district court, and remand with instructions to enter summary judgment for Appellants.

. Since our ruling today essentially moots any viable Fourteenth Amendment claims, we leave them for consideration on another day, if necessary.

. Canon 5 defines "political organization” as "an association of individuals under whose name a candidate files for partisan office”-a political party. Canon 5, subd. D.

.The dissent notes that an Advisory Committee was involved in post-Wtóe amendments to Canon 5. Minn.Stat. § 480.052. The Minnesota Supreme Court did make some amendments to Canon 5 to bring the provisions into *746 line with the Supreme Court’s “announce clause” ruling in White. But it should also be noted that the Advisory Committee recommended the deletion of parts of the partisan-activities clause of Canon 5 because the Committee believed, as do we, that it is not narrowly tailored. Several members of the Committee also noted, as do we, that the clause is impermissibly underinclusive because it applies only to political parties, and not to interest groups. The Minnesota Supreme Court was not responsive to these recommendations, and the partisan-activities and solicitation clauses at issue here are the same now as when this litigation was commenced.

. The strict scrutiny test contrasts with those inquiries used for speech not at the core of the First Amendment, "commensurate with [such speech’s] subordinate position in the scale of First Amendment values,” Florida Bar v. Went For It, Inc., 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995), or for regulations which only incidentally burden speech, United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). So-called "intermediate scrutiny” is applied to restrictions of commercial speech. See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).
A regulation that restricts free speech only incidentally will be upheld, under the O’Brien test, if (1) it is within the constitutional power of Congress or the legislature to enact it, (2) it furthers an important or substantial governmental interest, (3) the regulation is unrelated to suppressing free expression, and (4) its restriction of speech is "no greater than is essential to the furtherance of that interest.” O’Brien, 391 U.S. at 377, 88 S.Ct. 1673. And some "narrowly limited classes” of speech enjoy no First Amendment protection. Chaplinsky v. New Hampshire, 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). "These include the lewd and obscene, the profane, the libelous, and the insulting or ‘fighting’ words ....” Id. at 572, 62 S.Ct. 766.

. Some of those policies have included apprehending highly mobile criminal suspects, deterring murder, avoiding the harms of illicit drugs, realizing consumer benefits in licensing requirements for professionals, and upholding the administration of justice. See Stephen E. Gottlieb, Compelling Governmental Interests: An Essential But Unanalyzed Term in Constitutional Adjudication, 68 B.U. L.Rev. 917, 935 n. 85 (1988) (collecting cases).

. The teachings of Florida Star make it clear that where a law is underinclusive to such a degree that the stated interest is not meaningfully protected, a state’s claim that the interest is vital enough to abridge core constitutional rights is substantially attenuated. 491 U.S. at 541-42, 109 S.Ct. 2603 (Scalia, J„ concurring).

. In their supplemental brief to the en banc court, Appellees attempt to resurrect from earlier arguments to the court a notion of "independence,” separate and distinct from "impartiality,” that seeks to maintain real and apparent separation of the judiciary from political influences as a compelling state interest. The partisan-activities clause in particular, they argue, serves this interest by "ensuring] that the public views the judiciary as being independent of the strong political influences that pervade legislative and executive branch elections and continue to strongly influence legislative and executive branch decisions thereafter.” Supplemental Br. on Remand of Defendants-Appellees at 10. This argument, however, falls prey to the same inherent underinclusiveness of Canon 5 that we discuss, post at 759-60, with regard to its regulation of activities that concern only political parties.
*752 We note that Appellees fret over the kind of influence political parties have in not only elections, but also governmental decisions made thereafter. This case, ’ however; is not about what happens after an election. And in whatever measure this concern is addressed to political parties, it must equally apply to interest groups. By way of illustration using the legislative context Appellees mention, it is likely that the AFL-CIO concerns itself just as much as do the political parties with who chairs the legislative committees dealing with labor matters. And Minnesota’s bar associations and trial lawyer associations almost certainly express as much interest as do the political parties in who leads the judiciary committees. While the record does not discuss this point, it is an unavoidable political reality. The essential point is that treating political parties differently than interest groups lies at the heart of the underinclusiveness problem in this case. Such underinclu-siveness bedevils any claim that "independence” is a compelling state interest because consorting with politically active interest groups-certainly a source of equally worrisome potential for influence or the appearance of influence-is not regulated at all, as we discuss in more detail, post at 759-60. Thus, we proceed under Minnesota's original interchangeable use of "impartiality” and "independence.”
The Minnesota Supreme Court’s refusal to adopt the recommendations of~its Advisory Committee discussed in footnote 3, ante at 745-46, seems to have prompted the dissent to advance yet another previously unrecognized and unprecedented definition of judicial independence-a separation of powers theory. The Minnesota Supreme Court said,
[T]he separation of powers inherent in the creation of three distinct branches of government, one of which is the judicial branch, in article III, section 1 of the Minnesota Constitution provides the constitutional underpinning for the independence of the Minnesota judiciary. As the executive and legislative branches are inextricably intertwined with partisan politics, maintenance of an independent judicial branch is reliant on the freedom of its officials from the control of partisan politics.
In re Amendment of the Code of Judicial Conduct, No. C4-85-697, slip op. at 4 (Minn. Sept. 14, 2004) (emphasis added).
Our opinion recognizes, citing Gregory v. Ashcroft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), the right of a state to organize its government and to provide for separation of powers in its governmental structure. Ante at 747-48. We also recognize the Supremacy Clause of the Constitution and the requirement that state action may not violate the Constitution-including the First Amendment. Id.
There are, however, at least two other basic frailties to the dissent's arguments regarding Minnesota’s interest in any separation of powers. First, neither the Supreme Court, nor any other court that we could find, has ever determined that a state’s interest in maintaining a separation of powers is sufficiently compelling to abridge core First Amendment freedoms. While the dissent states that a separation of powers is a basic concept in Minnesota’s constitution, the right to free political speech and association guaranteed by the First Amendment to the United States Constitution is no less basic a concept. Indeed, First Amendment rights are even more fundamental. The right to free and open elections undergirds the framework of government established by any constitution, state or federal. Second, nothing in our opinion or the remedies sought by Appellants serve to further blur any existing lines between the judicial, legislative and executive branches of Minnesota state government. Rather, it is the actions of the Minnesota Supreme Court in adopting Canon 5 that have, in fact, taken the courts into what the dissent describes as the "political branches” of government and compromised any separation of powers framework established by Minnesota’s constitution.
Though the Minnesota constitution allows the legislature to provide for disciplining judges, and the state legislature has given the Minnesota Supreme Court the authority to censure or remove judges and to promulgate rules of conduct for lawyers, through Canon 5, and without apparent constitutional or statutory authority, the Minnesota Supreme Court has stepped into the legislative arena in an attempt to regulate the political climate of statewide elections, an authority seemingly granted only to the Minnesota legislature under its plenary powers. Minn. Const, art. 6, § 9; Minn.Stat. § 490.16; Minn.Stat. § 480.05. See Minn.Stat. §§ 200.01 et seq. (Minnesota legislature’s enactments regarding statewide elections). Indeed, without any stated or readily discernible authority whatsoever, the Canon writes political parties out of statewide judicial elections and allows other political interests to fully participate in a totally unregulated manner.

. The dissent expands the Supreme Court's articulation of judicial “openmindedness” in White by importing an “anti-corruption” element from Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), post at 768-69. But, Buckley is a case involving the regulation of the size, source and use of political contributions. It does not deal with the direct suppression of core political speech and association at issue in this case. And, there is nothing in the record that supports the interposition of the anti-corruption concerns advanced by the dissent.
The dissent also seeks to insert anti-corruption arguments discussed in McConnell v. FEC, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), yet another political contributions case, into the candidate speech and association issues before us today. However, the Supreme Court, in McConnell, did not once cite White in the entirety of its 251-page opinion dealing with the corrupting influence of "soft” money and the political communications such money can buy. In addressing the legislation at issue in McConnell, the Supreme Court noted that the Bipartisan Campaign Reform Act of 2002 “regulates the use of soft money [as defined in the opinion] by political parties, office holders, and candidates.” 540 U.S. at 132, 124 S.Ct. 619. The Court further states that the Act, “primarily prohibits corporations and labor unions from using general treasury funds for communications that are intended to, or have the effect of, influencing the outcome of federal elections.” Id. Neither Buckley nor McConnell is a strict scrutiny case, though the dissent acknowledges that strict scrutiny applies in this case. See post at 73 n. 22. As stated in McConnell, " 'there is no place [in this "soft money” case] for a strong presumption against constitutionality, of the sort often thought to accompany the words "strict scrutiny.” ’ ” 540 U.S. at 137, 124 S.Ct. 619 (quoting Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 400, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000)). In keeping with this, the Court applied a "less rigorous [than strict scrutiny] standard of review.” Id. And McConnell's one paragraph review of an underinclusiveness argument did not lay out any rule applicable to this case. The Court in White gave us the rule: “ '[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a *757 restriction upon ... speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.’ ” 536 U.S. at 780, 122 S.Ct. 2528 (emphasis added) (first alteration in original) (quoting Florida Star, 491 U.S. at 541-42, 109 S.Ct. 2603 (Scalia, J., concurring)). In Buckley, the Court explained the use of two differing standards of review to governmentally imposed restrictions on election-related activities. The Court analyzed campaign contributions, and their reasonable limitations, under a "sufficiently important interest" standard that asked whether the limitations were "closely drawn to avoid unnecessary abridgement of [political] freedoms.” 424 U.S. at 25, 96 S.Ct. 612. And where the Court actually discussed rights similar to those at issue in this case, it imposed "exacting scrutiny applicable to limitations on core First Amendment rights of political expression.” Id. at 44-45, 96 S.Ct. 612. In fact, the Court stated clearly what we must keep in mind today:
[A] candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known [and associate with like-minded persons] so that the electorate may intelligently 'evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day. Mr. Justice Brandéis' observation that in our country public discussion is a political duty, applies with special force to candidates for public office.... [T]he First Amendment simply cannot tolerate [a] restriction upon the freedom of a candidate to speak [or associate] without legislative limit on behalf of his own candidacy.
Id. at 52-54, 96 S.Ct. 612 (quotation omitted).
In sum, Buckley and McConnell do not support’ an underinclusive or incremented approach to "strict scrutiny” analysis and the teachings of these cases do not support the dissent's position to the contrary.

. Rather, the fruits of Canon 5 appear to bear witness to its remarkably pro-incumbent character.
In 2004, of the three Minnesota Supreme Court seats up for election, only one was ' contested. (Originally, two seats were contested, but a challenger was disqualified.) Minnesota Lawyer, Judicial Elections 2004 (2004), at http://www.minnlawyer.com/elec-tions/2004/uncontested.cfm (last visited Feb. 10, 2005). In the race that was contested, the incumbent enjoyed a nearly thirty-two percent margin in contributions from outside, non-loan sources. Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2004). The data from the Minnesota Court of Appeals is even more striking. Of the five Court of Appeals seats up for election, only two were contested. Minnesota Lawyer, Judicial . Elections 2004 (2004), at http://www.minnlawyer.com/elections/2004/ uncontested.cfm (last visited Feb. 10, 2005). In those two races, the incumbents were able to collect a combined total of $104,172.21 in contributions against a combined challengers’ total of just $4,546.46-nearly twenty-three *759 times as much. Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2004).
In 2000, Supreme Court incumbents raised a combined $505,120.66. Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2000). Only two of the challengers raised enough money to trigger disclosure. Their combined total was $23,582.67. Id.
Notably, donations from lawyers and law firm-related political funds account for a substantial portion of incumbents' re-election war chests. In one 2004 Court of Appeals race, such contributions accounted for over forty-three percent of the incumbent's total campaign funds. Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2004). In the 2004 Supreme Court race, they made up over half of the incumbent’s funds. Id.

. The record informs us of activity on the part of the League of Women Voters to publish a voter's guide regarding candidates and their views; the Minnesota Family Council urging Minnesotans to join the fight to defend traditional Judeo-Christian values; Lavender Magazine, which describes its readership as including the politically active gay-lesbian-bisexual-transgender community, providing a voter's guide; the Minnesota Women Lawyers, whose mission is to pursue equal participation for women in the legal profession, seeking to endorse judicial candidates for office; People for Responsible Government, a *760 group interested in the accountability of government to the people, holding a forum on judicial reform issues; and the state and local bar associations.

. The dissent appears to assert a newly minted state interest described as “protecting the judicial process from extraneous coercion.” Post at 767. Although the dissent claims that such interest “has been recognized as compelling,” id., it cites no precedent for the proposition and we have found none. Neither does the dissent flesh out the nature and source of this purported “coercion.” While it .argues that political parties are the source of such coercion, we find no evidence in the record to support that. And the dissent does not include political interest groups in its concern about coercion, notwithstanding such groups' many well documented forays into judicial selection matters.
While the dissent is concerned about political party involvement in judicial selection, state law itself inculcates partisan interests into the process. For example, when a justice of the Minnesota Supreme Court resigns shortly before the end of a term of office, a practice widely followed in Minnesota for many years, the governor, who is selected on a partisan ballot and is usually considered the current head of his or her party, selects and appoints a successor who is almost always a member of the governor’s own party. Minn. Const, art. 6, § 8. Published history shows that these patronage-propounded selectees are often, if not always, former partisan office holders or party activists. The political appointee then serves a term that lasts until the next general election occurring more than one year after the appointment. Id. Through this device, the gubernatorial designee is able to stand for election on the non-partisan judicial ballot ostensibly as an incumbent office holder, fully protected by Canon 5 from the rigors of a constitutionally sound political exercise. Indeed, all but one of the present members of the high court and twenty-three of the last twenty-five Supreme Court Justices ascended to the Minnesota bench in this manner. Minnesota State Law Library Docket Series: Chronological List of Justices and Judges of the Minnesota Appellate Courts (2005), at http://www.lawh-brary.state.mn.us/judges.html (last visited June 6, 2005). This partisan involvement in judicial selection, fully sanctioned by the Minnesota constitution, is direct and personal and filtered not at all by the ballot box.

. The panel majority in Kelly reasoned that treating political parties differently from interest groups is further justified given political parties' "powerful machinery,” including a large membership, to enforce adherence to their views. 247 F.3d at 876. The majority *761 also concluded different treatment was called for "because political parties have comprehensive platforms,” and thus “obligation to a party has a great likelihood of compromising a judge's independence on a wide array of issues.” Id. Yet, this does not account for the regulation of those Minnesota political parties that have a more limited membership, or that limit their focus to only a few issues, including the Constitution Party, the Natural Law Party, and the Green Party. Canon 5’s oversight of these parties calls into question the asserted "powerful machinery” and "comprehensive platform” rationales for regulating political parties but not interest groups, and exposes the fact that, arbitrarily, it is the mere designation of a group as a "political party” that invokes Canon 5’s regulation.

. For instance, in testimony before the Minnesota Supreme Court in 1997 regarding proposed amendments to Canon 5, the Honorable Gary J. Meyer, Chief Judge of Minnesota’s Tenth Judicial District, testified that his assignment area passed a resolution supporting amending section 5D-the definition of "political organization”- to "include not just political parties but all organizations, ... though not individuals, which endorse candidates for elected office.” Hearing on the Amendment to Canon 5 of the Code of Judicial Conduct, C7-81-300, Tr. at 36 (Minn. Nov. 19, 1997). Judge Meyer pointed out that, regarding Minnesota’s purported concern about keeping partisanship out of judicial campaigns, "you do not take partisan politics out of a judicial election simply by excluding support from political parties.” Id. His testimony highlighted the same concerns we raise here today:
The definition of political organization in Paragraph D effectively ... limits the term [to] "political parties.” It [thereby] allows a candidate for the judiciary to seek and use the endorsements of such special interest groups as the National Rifle Association, the Minnesota Citizens Concerned for Life, the National Organization for Women, Mothers Against Drunk Drivers, or any labor union. Clearly, organizations such as these can and frequently do support and oppose candidates for political office.... It appears that the proposed changes to Canon 5 are an attempt to strip political affiliation from judicial elections, but at the same time, they allow and perhaps encourage candidates to adopt issue group affiliation. This doesn't take party politics out of the judicial election.... [I]f you’re going to exclude one, why not exclude them all? It seems to me that it doesn’t make a ... judicial election any less political.... I question why it’s appropriate to deny a judge the ability to have literature distributed with his or her political party while at the same time allow an opponent to seek MCCL [Minnesota Citizens Concerned for Life] support and distribution of their literature endorsing the opponent in church parking lots on the Sunday before the election. Is it fair for a judge who supported a no guns peace policy within his or her political party to not be able to seek'the help of that party against an opponent who seeks and uses the NRA mailing list for an endorsement? Why should a judicial candidate be able to solicit labor union support and eventually its sample ballot, but not ... the support of the political party for which he or she worked for many years? Is it appropriate for a judicial candidate to speak and appear at a MADD, Mothers Against Drunk Drivers, function but not [at] a political party [function]? Why should these special interest endorsements and activity be protected as constitutionally guaranteed free speech and assembly but political party endorsements and activity not be so protected!?]
Id. at 36-38, 40-41.

. We also do not "doom,” by setting the bar too high, all future attempts by Minnesota to adopt judicial election regulations that will pass strict scrutiny. Post at 79. The dissent says that we should apply strict scrutiny with deference to states that choose to address only some threats, and that if we do not, we "occupy the enviable position of not being required to say in advance what line would be permissible,” but can simply veto every attempt made at regulation. We respectfully believe this incorrectly characterizes our position and suggests a course of action that no Article III court ought to entertain.
First, we approach this case with the posture the Supreme Court has long prescribed for this inquiry: "it is the rare case in which ... a law survives strict scrutiny.” Burson, 504 U.S. at 211, 112 S.Ct. 1846. A law subject to strict scrutiny because it regulates speech based on its content is presumptively invalid. Ashcroft v. ACLU, 542 U.S. 656, 124 S.Ct. 2783, 2788, 159 L.Ed.2d 690 (2004). And we do not carte-blanche veto Minnesota’s regulations. The court’s opinion today meticulously analyzes, in light of White, the relevant portions of the partisan-activities and solicitation clauses, as strict scrutiny demands.
Second, we deal, as we should, only with the regulations presented to us today to determine whether the lines drawn by them pass the rigors of strict scrutiny. In making this determination, we cannot overlook the fact that Minnesota unevenly regulates various political groups that have the potential for the same electoral impact that the state cites as justification for its regulations. In carefully applying Supreme Court precedent, we are not in any way exercising a "veto.” We simply apply strict scrutiny as required.
Finally, we would flirt with rendering an advisory opinion, or stepping into the legislative arena ourselves, were we to tell Minnesota how to structure its election laws. If the state is unable to strike a balance with its regulations that satisfies strict scrutiny, that does not indicate a failing of the inquiry; rather, it quite likely indicates that the state has impermissibly trod where it may not.

. The dissent cites polls from, other states that show concern on the part of those surveyed that lawyers’ and plaintiffs' campaign contributions to judicial candidates influence the decisions of judges. Post at 774-75. The dissent asserts that political parties embody similar threats of "outside influence” on the judiciary. But these poll numbers provide clear evidence that the perception of influence is of a far different kind, one that is not regulated by Canon 5.
While Canon 5 severs judicial candidates from like-minded voters during an election, it expressly allows lawyers, law firms and other interest groups to donate money to their campaigns. In the 2004 Minnesota Supreme Court election, approximately thirty-two percent of all campaign contributions came from law firm political funds and lawyers. Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2004). And in the only contested race, over ninety-seven percent of such contributions went to the incumbent. Id. We need not speculate about the impact these lawyer contributions have on the appearance of the judiciary's integrity-the poll numbers noted by the dissent leave little question.

. While it is argued that the addition of a candidate's personal signature increases the chances that a candidate will discover the source of contributions because some contributors will send donations directly to the candidate, such a contention is pure conjecture. Though the candidate’s personal signature may appear at the foot of the letter, certainly the address included in the letter to which donations are to be sent will be that of the candidate’s campaign committee, if Canon 5 is followed. It would take special effort on the part of a contributor to find the personal or business address of a candidate in order to send a direct contribution. But that would be possible even if the candidate did not personally sign the letter. Presumably, any contribution letter will, and should, include the name of the candidate for whom a donation is sought. With that information, the same effort could be expended by a contributor bent on sending a donation directly to the candidate. Adding a candidate's personal or facsimile signature does not alter the potential that a devoted contributor with a little time on his hands might short-circuit Canon 5's interposition of the campaign committee. At any rate, any number of other-more likely-scenarios allowing a candidate to stumble onto the names of contributors are possible, particularly since very specific information about campaign contributions are publicly available, notably on the Internet, from the Minnesota Campaign Finance and Public Disclosure Board. A chance meeting with a supporter who has made a contribution or viewed such information could just as easily result in the supporter commenting to the candidate about contributors to the campaign. This is, at least, no more conjecture than assuming that a contributor will send a contribution directly to a candidate as a result of the candidate's signature on the letter.