BEAM, Circuit Judge,
with whom RILEY, Chief Judge, joins,
dissenting.
Minnesota elects its judges. Minn. Const. art. 6, § 7. Since judicial elections are subject to the full panoply of rights protected by the First Amendment, Republican Party of Minnesota v. White, 586 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (White I), I confess to “some bias in favor of a system for the appointment of judges,” Republican Party of Minnesota v. White, 416 F.3d 738, 746 (8th Cir.2005) (en bane) (White II). But, the people of Minnesota have four times rejected the so-called Missouri Plan under which the governor fills vacancies on the courts by nonpartisan appointment, subject only to a retention vote. Maynard E. Pirsig, The Proposed Amendment of the Judiciary Article of the Minn. Constitution, 40 Minn. L. Rev. 815, 815-19 (1955-56); Peterson v. Stafford, 490 N.W.2d 418, 421-22 (Minn.1992).
Attempting to ameliorate partisan political influence in these contests, the Minnesota legislature made judicial election ballots non-partisan affairs. Peterson, 490 N.W.2d at 422; Minn.Stat. Ann. § 204B.06(6). In addition, incumbent members of the Minnesota Supreme Court (sometimes Minnesota), through various subalterns named in this litigation (collectively the Appellees), often in the name of judicial “independence,” “impartiality,” and “integrity,” long ago began to enact rules and regulations of judicial behavior, including conduct during judicial elections. See generally 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.
These election-conduct rules, several of which have now been deemed unconstitutional, see White I and White II, have created headwinds for non-incumbent aspirants for judicial office in the state. A non-incumbent candidate has been elected to the Minnesota Supreme Court only twice since 1947. Justice Peterson was elected to an “open seat” on the court in 1966. And, Justice Alan C. Page was elected in another “open seat” election in 1992. According to press accounts, “Page [a pro-football icon and Hall of Fame member of the Minnesota Vikings] forced the open seat on the court by suing after Gov. Arne Carlson extended Associate Justice Lawrence Yetka’s term for 22 months. A panel of judges ruled the governor’s term extension authority did not apply in Yetka’s case.” Pam Schmid, Alan Page: A Seat on Bench But This Time It’s an Honor, Seattle Post-Intelligencer, Nov. 5, 1992, at D11. Otherwise, only incumbents have prevailed. This incumbency success rate is partly driven by a state constitu *1036 tional provision, Minnesota Constitution article 6, section 8, that allows a governor to appoint a judge when a vacancy arises and provides that the replacement shall serve at least one year. Taking advantage of this provision, currently sitting Minnesota judges have routinely tended to retire shortly before the end of their last term, allowing the appointed replacement to garner the benefits of incumbency before having to face an election. One of these benefits occurs because in 1949, the Minnesota legislature changed the form of ballot used in judicial elections by placing the word “incumbent” by the names of judges running for re-election, including those recently appointed by the governor. This practice remains in place today. George W. Soule, The Threats of Partisanship to Minnesota’s Judicial Elections, 34 Wm. Mitchell L. Rev. 701, 704 (2008).[17]
Also, certain regulations have apparently created circumstances leading to a mismatch in the ability of incumbents and non-incumbents to raise campaign funds, the “mother’s milk” of electoral success. McConnell v. FEC, 251 F.Supp.2d 176, 481 (D.D.C.2003) (quotation omitted). State campaign finance records indicate that in 2008 and 2010, incumbent candidates for contested elections for the Minnesota Supreme Court raised $207,369.62 in campaign funds as compared with $109,114.24 *1037 for non-incumbent opponents. One incumbent ran unopposed and raised $5,865.46. And, if press accounts and financial disclosure records are to be believed, some portion of this mismatch arises from Minnesota-based law firms that reportedly have organized an “incumbent’s re-election fund,” perhaps recognizing from earlier election results that there is greater certainty in picking the winner, when supporting an incumbent. Nick Coleman, Judges Shouldn’t Be Courting Votes, St. Paul Pioneer Press, Nov. 12, 1992, at IB (hereinafter “Coleman”); Associated Press, Legal Experts Troubled by Gifts from Lawyers to Judges’ Campaigns, St. Paul Pioneer Press, Oct. 25, 1992, at 3B (hereinafter “Associated Press”) (“Minnesota has had a longstanding tradition of a separate group such as the Minnesota Justices Committee raising campaign money for incumbent judges.”).[18]
In an admitted attempt to abate these headwinds and to somewhat level the playing field, Appellant Wersal has successfully instituted litigation to help remedy some of his non-incumbency problems. See White I and White II. Seeking further relief, he now challenges the constitutionality of additional rules, at least one of which was recently amended and newly imposed by the Appellees as a result of White II.
As I explain below, Wersal’s new challenges are meritorious. Accordingly, I dissent from the conclusions of Judge Bye’s opinion and some portions of Judge Loken’s opinion.[19]
I. INTRODUCTION
Wersal has asserted and continues to assert that he wishes to conduct a range of election activities that he believes will tend to better his name recognition, campaign treasury and associational and communicational needs. To do so, he specifically challenges three regulations: the endorsement clause — Rule 4.1(A)(3) — and the two solicitation clauses — Rule 4.1(A)(4) and (6) — each of which rein in a judicial candidate’s [20] speech.[21]
*1038 The endorsement clause prevents a judicial candidate from “publicly endorsing] or, except for the judge or candidate’s opponent, publicly opposing] another candidate for public office.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(A)(3). The personal solicitation clause prohibits a judicial candidate from “personally soliciting] or accepting] campaign contributions,” id. Rule 4.1(A)(6), and the solicitation for a political organization or candidate clause provides that a judicial candidate shall not “solicit funds for a political organization or a candidate for public office,” id. Rule 4.1(A)(4)(a).[22]
The facts of this case indicate the degree to which the provisions of Canon 4, past and present, have chilled Wersal’s First Amendment speech and association rights. In early 2007, Wersal announced his intention to run for the office of Chief Justice of the Minnesota Supreme Court. As part of his campaign, Wersal wanted to publicly endorse certain other candidates for public office. Specifically, he desired to support Tim Tinglestad, candidate for Associate Justice of the Minnesota Supreme Court, Glen Jacobsen, candidate for Minnesota District Court Judge, and Michele Bachmann, candidate for United States Congress in an obvious attempt to become attractive to, and raise campaign money from, their supporters; to receive endorsements and helpful communications from the endorsed candidates and those backing them; and, by association, to announce as his own at least some of the governance ideas and principles advanced by the endorsed candidates. The endorsement clause prevented Wersal from engaging in any such electioneering activity.
Moreover, Wersal wanted to personally solicit funds for his 2008 campaign from “non-attorneys” by going door-to-door and by making personal phone calls asking for financial support. Wersal has pledged (and continues to pledge) to recuse himself from any case in which a known contributor is or becomes a party. However, the personal solicitation clause specifically barred him and continues to bar him from engaging in such activity.[23] Wersal also felt that the restraint upon solicitation of funds for a political organization or candidate clause further limited his efforts to seek campaign support and financial contributions for his own use from non-attorneys. Wersal’s emphasis on soliciting from non-attorneys may have been an attempt to offset the well-documented practice of Minnesota law firms more generously contributing to judicial incumbents than their non-incumbent challengers through their political funds and also through individual lawyers’ contributions from within the firms. See Coleman.
Accordingly, Wersal believed that he could not wage an effective campaign as *1039 long as the endorsement and solicitation clauses remained in force. He, therefore, asked for injunctive and declaratory relief in the district court. After it became apparent that Wersal would not be able to get adequate relief prior to the 2008 campaign, he decided not to run for the Minnesota Supreme Court in that year, but to instead run for the Minnesota Supreme Court during the 2010 elections. In furtherance of his 2010 campaign, Wersal wished to engage in conduct parallel to that which he sought to engage in during the 2008 campaign. However, just as in 2008, Wersal continued to feel unconstitutionally limited by the contested clauses.
It is important to note that the perceived benefits arising from these campaign activities do not necessarily accrue only to Wersal’s advantage. Minnesota voters are entitled to receive as much information about contesting candidates as possible, to the end that they are able to cast an informed ballot for the contender of their choice.[24]
The First Amendment provides that “Congress shall make no law ... abridging the freedom of speech.” U.S. Const. amend. I. Inherent within this protection is the “corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.” Roberts v. U.S. Jaycees, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); see also Buckley v. Valeo, 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (“The First Amendment protects political association as well as political expression.”). And, the First Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).
The political speech burdened by the clauses at issue in this case “is the very stuff of the First Amendment.” White II, 416 F.3d at 748. Indeed, ‘“the constitutional guarantee [of the freedom of speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.’ ” Id. (alteration in original) (quoting Buckley, 424 U.S. at 15, 96 S.Ct. 612). These rights and protections extend to campaigns for judicial office. White I, 536 U.S. at 774-88, 122 S.Ct. 2528.[25] Our *1040 system of representative democracy relies on such a protection of political speech, “for it is the means to hold officials accountable to the people.” Citizens United v. FEC, — U.S. -, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010); see also Buckley, 424 U.S. at 14-15, 96 S.Ct. 612 (“In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation.”). “For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence.” Citizens United, 130 S.Ct. at 898.
Indeed, so strong is the protection of political speech that the Court recently indicated that “it might be maintained that political speech simply cannot be banned or restricted as a categorical matter.” Id. However, the Court stopped short of placing a categorical ban on political speech restrictions, choosing instead to examine laws burdening political speech under “strict scrutiny.” Id. Thus, we only permit restraint of judicial political speech where, after strict scrutiny of the regulation, it is found to “advance[] a compelling state interest and is [found to be] narrowly tailored to serve that interest.” White II, 416 F.3d at 749. We measure the narrowness of tailoring by looking to the “factors of relatedness between the regulation and the stated government interest.” Id. at 751.
“When the government restricts speech, the government bears the burden of proving the constitutionality of its actions.” United States v. Playboy Entm’t Group, Inc., 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Here, Appellees have the burden to prove that their restraints address a compelling state interest, and are narrowly tailored to serve that interest. White I, 536 U.S. at 774-75, 122 S.Ct. 2528. Ultimately, “[s]trict scrutiny is an exacting inquiry, such that ‘it is the rare case in which ... a law survives strict scrutiny.’ ” White II, 416 F.3d at 749 (alteration in original) (quoting Burson v. Freeman, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)).
It is abundantly clear that the restrictions at issue in this dispute collectively limit Wersal’s political speech and his right to associate with others who share common political beliefs and aims. Thus, such restrictions may be validated only if they address a compelling state interest and then only after being subjected to narrow tailoring as defined by well established judicial precedent. Both Appellees and the plurality and concurrence correctly concede that “strict scrutiny” must be applied to each interest and regulation contested in this dispute. See ante at 1019, 1031-32.
It is equally clear that in carrying out its First Amendment tasks, this court is neither charged with, nor empowered to, override Minnesota’s constitution or its *1041 legislative enactments unless, of course, as in this case, they are at odds with the United States Constitution.[26] Nor are we to become affirmatively involved with the maintenance of, or enhancements to, wide-ranging, broadly focused and factually unsupported general inquiries into the institutional equanimity, probity or integrity of Minnesota’s judicial system as it may be viewed by the public in general. This is especially true if such effort and inquiry substantially disregards a judicial candidate’s First Amendment rights, as the work product of Appellees and the affirming opinions do today. See ante at 1021-24.
In Carey v. Wolnitzek, 614 F.3d 189 (6th Cir.2010), our colleagues on the Sixth Circuit Court of Appeals, with almost absolute precision, circumscribe the ambience in which we must review the issues in this appeal. The Carey court states, “[i]n modern America, judicial elections are no less relevant to the public policy concerns of the citizenry than legislative elections, and the First Amendment protects electioneering speech in the one context as vigorously as it does in the other.” Id. at 193. The court then says, “[a] State cannot simultaneously insist that judges be held accountable to the electorate at regular intervals but deny to sitting judges and candidates alike the communicative tools for explaining how they will be held to account.” Id. And finally, and in my view, most importantly, the Sixth Circuit notes that,
[tjoday ... we have a speech restriction aimed not at judges performing court functions but at judges and judicial candidates making campaign statements or solicitations outside of court and outside of the process of deciding cases in their official capacity — all for the purpose of communicating information to voters about whom they should elect.
Id. at 200. Because of this focus, my concern is solely with the effect the challenged clauses have on judicial candidates.
Accordingly, nothing in this dissent should be taken as any measure of disrespect for the probity, fairness and integrity of the courts of Minnesota in general. It is my view, but a view not presented for purposes of critique, that outside the framework of a judicial election, at least some portions of Minnesota’s Canons of Judicial Conduct may arguably be examinable at some lesser level than the strict scrutiny evaluations mandated by the “fullest and most urgent” levels of the First Amendment applicable to Wersal’s claims. Buckley, 424 U.S. at 15, 96 S.Ct. 612.
II. DISCUSSION
A. Wersal’s Electioneering Activities
Stripped to the bare essentials, Wersal seeks to be free to endorse other candidates for public office — judicial or otherwise. He also wishes to personally solicit or accept financial contributions for his campaign (within the legal limits established by the State of Minnesota and subject to all pertinent reporting requirements for campaign contributions), from any qualified contributor, individual or organization. He wants to be free to solicit funds for other political organizations or candidates if he believes that such activities may benefit his own name recognition, financial well-being and electoral needs.
In its attack on the justiciability of Wersal’s challenge to Rule 4.1(A)(4)(a) — which *1042 prohibits a judge or judicial candidate from soliciting funds for a political organization or candidate for public office-the plurality contends that Wersal only seeks to “solicit[ ] funds for his own campaign,” ante at 1018, and he can do that. This is a substantial misstatement of the record. Indeed, the plurality, after identifying several candidates, states ‘Wersal desired to publicly voice his support for the [listed] candidates through public statements, yard signs, phone calls, endorsement letters, and letters to potential contributors [to the candidates and their sponsoring organizations.]” Ante at 1017. These activities proposed by Wersal and restricted by the Appellees are, of course, constitutionally authorized mine-run election activities that may redound, directly or indirectly, to the benefit of his campaign. Accordingly, Wersal’s challenge is justiciable.
Wisely, the Appellees and the plurality do not contend that any of Wersal’s proposed campaign conduct in and of itself is not protected by the Constitution, especially the speech and associational conduct. As earlier noted, Wersal’s proposed campaign practices are “the very stuff of the First Amendment,” White II, 416 F.3d at 748, and are routine in elections to public office. Accordingly, under well established constitutional precedent, such activities may be limited, displaced, attenuated or prohibited by government regulation only if the regulation is narrowly tailored to the advancement of a carefully defined “compelling state interest.” Id. at 749. In other words, only after careful and concise identification of a compelling state interest by the Appellees may Wersal’s constitutionally authorized election activities be regulated at all, but, even then, only in the narrowly tailored manner authorized by the Supreme Court in White I.
B. Strict Scrutiny
The plurality and concurrence correctly concede that “strict scrutiny” is required in the evaluation of all interests, regulations and prohibitions disputed in this case.[27] As earlier noted, “political speech — speech at the core of the First Amendment — is highly protected.” White II, 416 F.3d at 749; see also Rutan v. Republican Party of Ill., 497 U.S. 62, 69, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (alteration in original) (quotation omitted) (“[P]olitical belief and association constitute the core of those activities protected by the First Amendment.”). Accordingly, any regulation which curtails such speech violates the Constitution unless it can withstand strict scrutiny review. White II, 416 F.3d at 749. To survive strict scrutiny, as has been repeatedly stated, the state must “show that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest.” Id. This examination “is best described as an end-and-means test that asks whether the state’s purported interest is important enough to justify the restriction it has placed on the speech in *1043 question in pursuit of that interest.” Id. at 750.
To determine whether an interest (the end) is “important enough” to justify the abridgement of core constitutional rights, we examine the regulation (the means) purportedly addressing that end. Id. If the interest is sufficiently compelling, then we ask whether the regulation (the means) used to meet that end is “narrowly tailored to serve that interest.” Id. at 751. Determining whether a regulation is narrowly tailored requires an examination of several related factors. As we stated in White II,
A narrowly tailored regulation is one that actually advances the state’s interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).
Id. In other words, a regulation which burdens political speech will only withstand constitutional scrutiny if it is “as precisely tailored as possible” to meet a very important end. Id.
In applying strict scrutiny to the circumstances of this dispute, I agree with the plurality and presume that guarding against judicial bias for or against either party to a proceeding is a “compelling state interest.” On the other hand, I disagree with the plurality when it says that “the perception the [general] public maintains regarding the judiciary’s lack of bias for or against either party to a proceeding,” ante at 1021-22 (citing Caperton, 129 S.Ct. at 2266), is a separate, viable compelling interest. But, for the limited purpose of consideration of Appellees’ contested regulations, I assume that it is.
Judge Loken, in the concurrence, purported to discern yet another separate and distinct “compelling state interest,” described by him as “judicial independence.” I likewise believe that no such interest exists within the framework of any judicial election required by the Minnesota Constitution. But again, for the limited purpose of considering Appellees’ contested regulations, I assume that it does.
Applying such presumption and assumptions, I conclude that the three regulations imposed upon Wersal by the Minnesota Supreme Court are wholly unconstitutional. I discuss each regulation in comparison with each compelling interest in order.
C. Compelling State Interest
The scrutiny of the contours of a “compelling state interest” as articulated by the government and “strict scrutiny” of a regulation promulgated by the government in derogation of First Amendment rights often overlap. But, without the initial identification of a compelling state interest that provides the raison d’etre[28] for the regulation in the first place, a candidate’s constitutional electioneering should be able to proceed uninhibited. At the outset, “[t]he State must specifically identify an ‘actual problem’ in need of solving.” Brown v. Entm’t Merck Ass’n, — U.S. -, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011) (quoting Playboy, 529 U.S. at 822, 120 S.Ct. 1878). “[A]nd the curtailment of free speech must be actually necessary to the solution.” Id. Also, clarity of meaning “is essential before we can decide whether [an asserted interest] is indeed a compelling state interest.” White I, 536 U.S. at 775, 122 S.Ct. 2528. Accordingly then, of necessity, our review must commence with the compelling interest inquiry.
*1044 1. Actual Bias
As in White I, Appellees advance judicial impartiality, divided into several subtexts, as compelling interests. Because several of the claimed interests were explicitly rejected by the Supreme Court in White I and by this court in White II, the plurality rightly disregards them and fully defines and advances for consideration the only impartiality interest that has been specifically validated by the Supreme Court. “ ‘[I]mpartiality’ in the judicial context— and of course its root meaning — is the lack of bias for or against either party to a proceeding” — the actual bias interest. Id.; see also White II, 416 F.3d at 753-54. I agree with the plurality that this “actual bias” formulation captures a compelling state interest. And, it is, as I explain shortly, the only “compelling state interest” truly at work in this dispute. While the actual bias interest may be underinclusive as applied, and thus not truly compelling, that is an issue that I later discuss in more detail.
But, I digress momentarily. Make no mistake about it, there is one additional compelling state interest involved here. It is an interest established by the electors of Minnesota in the state’s Constitution — not by the Minnesota Supreme Court — and it remains unmentioned in the plurality. It is the state’s overriding obligation to conduct judicial elections that pass constitutional muster. Minn. Const. art. 6, § 7.
2. Perceived Bias
Through rhetoric often employed to advance the concept that “judicial elections are different,” see, e.g., Peterson, 490 N.W.2d at 424, the plurality seeks to create from scratch a “compelling state interest” almost wholly untethered to any apposite judicial precedent, express or implied, and wholly unsupported by evidence that such interest is in fact compelling, at least within the context of a Minnesota judicial election protected by the mandates of the First Amendment. And, as earlier noted, the burden of proof and production rests squarely upon the Appellees.
In this quest, the plurality segues from the Supreme Court’s clearly limited “party to a proceeding” judicial bias definition to the plurality’s newly birthed “implied visualization” definition dedicated to “preserving the appearance of [judicial] impartiality” in the eyes of the general public, an interest, says the plurality, “separate and distinct from the state’s interest in preventing actual bias.” Ante at 1021. This new interest is explained by the plurality as “the perception the public maintains regarding the judiciary’s [necessary] lack of bias for or against either party to a proceeding.” Id. at 1021 (emphasis added). The supposed interest does not by definition require a particularly identifiable judicial officer, reasonably knowable parties, (except, perhaps, any member of the general public), or even a venued proceeding of any kind. The plurality’s new interest seems to be a “we think the public will not like the looks of this kind of activity” sort of thing. Aside from the insurmountable obstacles presented by “burdens of proof,” “narrow tailoring” and “strict scrutiny” as these factors have been identified, defined and imposed by the Supreme Court, the precedent advanced by the plurality in support of its newly minted appellation are more than substantially unavailing.
The plurality contends that,
White I and White II both implied [that] preserving the appearance of impartiality [apparently in the minds of the public] constitutes a compelling interest, separate and distinct from the state interest in preventing actual bias. See White I, 536 U.S. at 776, 122 S.Ct. 2528 (analyzing the tailoring of the announce clause to the state’s interest in impar *1045 tiality “or the appearance of impartiality”); White II, 416 F.3d at 755, 758-59 (discussing the tailoring of the partisan-activities clause as it related to Minnesota’s interest in the appearance of impartiality).
Ante at 1021.
Perhaps the plurality has forgotten that the announce clause, White I, 536 U.S. at 776, 122 S.Ct. 2528; and the partisan activities clause, White II, 416 F.3d at 756, referred to above, (and also an earlier version of the solicitation clause, id. at 766), have been deemed unconstitutional. Of even more importance, there is a total dearth of words surrounding either citation that supports the plurality’s supposed implication. Indeed, the language is to the contrary. In this regard, the Supreme Court states, for instance, “[w]e think it plain that the announce clause is not narrowly tailored to serve impartiality (or the appearance of impartiality)” in the sense of judicial bias in a specific judicial proceeding. White I, 536 U.S. at 776, 122 S.Ct. 2528 (emphasis added). And, applying strict scrutiny, a “law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.” Id. at 780, 122 S.Ct. 2528 (quotation omitted). Nowhere within this above-quoted language or anywhere else in White I is there even a hint that the Supreme Court supports the plurality’s conclusions.
Likewise, none of the cases cited by the plurality in support of this new interest actually involve a ballot contest protected by the First Amendment. Buckley, 424 U.S. 1, 96 S.Ct. 612, deals with political contributions and funding limits imposed by the Federal Election Campaign Act of 1971, not any specific election or group of elections. And, Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), discusses the constitutionality of federal sentencing guidelines and judicial branch participation on a sentencing commission. In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), concerned Michigan’s use of its so-called one-man grand jury act and says nothing pertinent to judicial elections and the First Amendment. And, finally, Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), concerned “extraordinary” campaign contributions made to an elected judicial candidate who later ruled on an appeal of an action in which the contributor in question was a party. The case in no way sought to regulate a judge’s First Amendment campaign rights. It is also important to note that all cases cited by the plurality, except Caper-ton, were decided well before the Supreme Court reminded us in White I that judicial elections actually are no different than all other election contests, except in the most limited of circumstances. Id. at 2264-65.
While the Appellees and the plurality yearn for a factual or textual anchor for this newly minted interest, there is none. Applicable text, as exemplified by the Minnesota Constitution (requiring election of judges), the First Amendment (applying free speech protections in judicial elections) and Minnesota’s Code of Judicial Conduct, Rule 2.11 (defining and requiring disqualification), runs in the opposite direction. They all demand a specific proceeding, a specific judge and discernible, not speculative, adversaries.[29]
The plurality attempts to override this contrary textual material with multifaceted emanations from the American Bar Associ *1046 ation’s Model Judicial Code and writing from the publish-or-perish world of legal academia. Ante at 1021-24. None of these writings, of course, directly discuss Wersal’s concerns in the context of judicial elections protected by the First Amendment.
The plurality makes no real attempt to factually support or precisely define its “public perception bias” claim in the context of judicial elections, except, of course, in broad, general and imprecise (and often confusing) articulations, and without focused judicial precedent. The plurality says,
actual impartiality concerns the mental state of a particular judge, whereas the appearance of impartiality arises from the public’s perception of that judge ... the appearance of impartiality often stems from the collective awareness of the public.... Instead of aiming to protect the due process rights of actual parties to a case, maintaining the appearance of impartiality is systemic in nature, as it is essential to protect the judiciary’s reputation for fairness in the eyes of all citizens.
Ante at 1022 (emphasis added). So far so good if you are intent on disregarding a judicial candidate’s tangible and well established First Amendment protections in deference to an unproven “collective awareness” of the public’s implied visualization. Id.
The inclusion of the public as a whole into this “perceived bias” interest changes the entire dynamic of determining through strict scrutiny whether such an interest exists, or not. This is because the interest purports to insert itself into the “collective awareness” of the Minnesota public in protection of the Minnesota judiciary’s reputation for “fairness [lack of perceived bias] in the eyes of all [Minnesota] citizens” — not simply a specific party allegedly suffering actual bias in an identifiable judicial proceeding. Id. This, then, opens the interest to the public’s view of every facet of Minnesota’s judicial election process and is the antithesis of the narrow tailoring required by strict scrutiny. This is so because such “collective awareness” will certainly not be garnered from the actions of judicial candidates alone but from a plethora of judicial election related actions undertaken by a broad range of entities and individuals participating directly and indirectly in the judicial electoral process— candidates, campaign committees, lawyers, law firms, contributors, solicitors, endorsers, supporters, opponents, the press and others too numerous to mention. But, the Minnesota Supreme Court has chosen to protect this “perceived bias” interest against only the actions of “judicial candidates.” As a result, this interest addresses so few of the influences at work that it is woefully underinclusive. The interest as protected by only the offending clauses at issue leaves so many stones unturned that the interest cannot be, in any sense, considered compelling. This underinclusiveness is fatal to the sustainability of this purported interest as fabricated by the Appellees.
In White II, we said that a clear indicator of the degree to which an interest is compelling is the tightness of the fit between the regulation and the purported interest: where the regulation fails to address significant influences that impact the purported interest, it usually fleshes out the fact that the interest does not rise to the level of being “compelling.” White II, 416 F.3d at 751.
This idea — that underinclusiveness suggests that a purportedly compelling interest is not so compelling after all — has support in Supreme Court precedent. See City of Ladue v. Gilleo, 512 U.S. 43, 52, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (noting that underinclusiveness “diminishes] *1047 the credibility of the government’s rationale for restricting speech”); see also, Eugene Volokh, Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny, Essay, 144 U. Pa. L. Rev. 2417, 2420 (1996) (“A law’s underinclusiveness— its failure to reach all speech that implicates the interest — may be evidence that an interest is not compelling, because it suggests that the government itself doesn’t see the interest as compelling enough to justify a broader statute.”). More specifically, the Court has reasoned that, even if an interest is potentially compelling in the abstract, underinclusiveness suggests it is not a compelling interest that the state has chosen to pursue. White I, 536 U.S. at 779-80, 122 S.Ct. 2528.
As I review the plurality’s perceived bias interest, I note that the opinion purports to apply the interest to both the endorsement clause, ante at 1024-25, and the personal solicitation clause, ante at 1030. The plurality makes no attempt to consider the organization and candidate solicitation clause because of its erroneous affirmance of the district court’s earlier conclusion that Wersal’s challenge to that clause was not justiciable.
However, discussing the first two rules will abundantly prove my point. While a judicial candidate is precluded from endorsing or opposing another candidate for election to a particular office, it appears that a judicial candidate may approve or disapprove of another candidate’s job performance, campaign platform, point of view on an issue, prior opinions, campaign communication, or any other communication on any subject. Further, a judicial candidate may seemingly endorse or oppose any individual for any office so long as such endorsement or opposition comes prior to the filing of that individual as a candidate for the office. A judicial candidate may solicit and receive endorsements from, or be publically opposed by, lawyers, office holders and entities of any description, and from non-lawyers, even those who are frequent litigators in the courts of Minnesota. How Appellees’ perceived bias interest can escape being influenced by these unregulated actions is not explained by either the Appellees or the plurality.
The matter of personal solicitation of funds by a candidate is an even more startling example of underinclusiveness when directed against this perceived bias interest. The personal solicitation clause is premised upon the candidate not becoming aware of who gives and who does not give to his or her campaign, a false concern at best as I will explain shortly. But, Minnesota requires detailed reporting of contributions to judicial candidates including name, address and occupation of the contributor and, of course, the identification of the candidate. Election officials publish this information and the media reports upon compiled information, often and in detail. The rules do not and, indeed, could not preclude the public from knowing who gives to a candidate, or how much and how often. The public reports disclose that lawyers and their firms are by far the largest and most persistent contributors to judicial candidates, especially incumbent judges seeking re-election as noted earlier. The reports also disclose that organizations and non-lawyer individuals who are public figures and, sometimes, frequent litigators or representatives thereof, may also be contributors. The Minnesota Supreme Court, of course, does not and cannot constitutionally or statutorily shield the general public referred to in the perceived bias interest from this information. And the court provides no discipline for a judicial candidate who purposely or inadvertently reads or hears of these reports. It is the Appellees’ and the plurality’s illusion, not the public’s, that Minnesota citizens do not possess knowledge that lawyers — who, of course, have more than a passing economic inter *1048 est in the operations of the Minnesota court system, and who are often an incumbent judicial candidate’s larger and more persistent contributors — make substantial contributions to candidates and that this information is somehow less damaging to the perceived bias interest than a judicial candidate’s knowledge of who gave or did not give to his or her campaign.
Finally, and importantly, the personal solicitation clause presents an obvious matter of underinclusiveness not discussed by the Appellees or the plurality. And the matter is of substantial import to both the existence of a compelling interest and the scrutiny of the regulation. The clause prohibits Wersal’s core political speech as he goes door-to-door soliciting campaign contributions from non-lawyers (and from lawyers as well for that matter).[30] And, as earlier noted, the premise of this limitation is the shielding of the candidate from knowledge of who contributes and who says no. This, says the Appellees, avoids the accrual of bias on the part of the candidate, if elected, for or against a party or a potential party to any proceeding. But neither this nor any other clause precludes Wersal from going door-to-door seeing the same individuals to ask for their vote or a pledge of their vote on election day. And, some will almost certainly say yes and others will probably say no, or not respond. As a matter of accrual of bias for or against any individual, it is difficult, if not impossible, to distinguish the difference between the contribution request and the vote-for-me request. It is true that the money may be used for political advertising that reaches many more potential voters than the labor-intensive task of door-to-door vote solicitation. But, remembering who said yes and who said no at the time is unlikely in the extreme.
Given that more voters may be reached by the campaign advertisement than the door-to-door vote solicitation campaign, a pessimist or a skeptic might be inclined to believe that the money solicitation prohibition is a much more effective deterrent to a successful election campaign by a non-incumbent than the more time-consuming door-to-door vote-for-me request. In sum, the plurality’s statement that “we easily conclude [from its listed sources that] Minnesota’s interest in preserving [through Appellees’ regulations] the appearance of impartiality [in judicial elections protected by the First Amendment] is compelling,” ante at 1023, is simply wrong. Indeed, the purported compelling interest based upon a public perception of bias is, at best, substantially underinclusive, contrafactual, generalized, speculative, presumptive, abstract and spun from the thinnest of constitutional gossamer.
3. Judicial Independence
Judge Loken correctly rejects Judge Bye’s “impartiality interests” through which Judge Bye upholds the constitutionality of the Appellees’ endorsement restrictions. Even as he does so, however, he concurs in a judgment that enforces the endorsement regulation. His concurrence, interestingly, proceeds via the adoption of a separate, narrow and “distinct” interest, one labeled “judicial independence.” Judge Loken makes little effort to define or even set forth discernible contours for this interest. He articulates no “direct causal link” between the endorsement regulation and the purported harm he seeks to avoid as required by Brown, 131 S.Ct. at 2738. He quotes Alexander Hamilton’s summarization of the importance of judicial independence[31] and an op-ed piece by columnist George Will. Ante at 1033.
*1049 Judge Loken appears to find support for his judicial independence interest because it “was not considered by the Supreme Court in deciding [White I ],” ante at 1033. Embracing, I presume, the inference that because the Court did not deal with the issue when presented by the Appellees in the course of White I, it obviously remains a viable and established interest for present consideration. But, the value of this happenstance is refuted by the Supreme Court’s recent opinion in Howes v. Fields, — U.S. -, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012). In Howes, the Court of Appeals adopted a per se rule of “custody” for a prison inmate, relying upon the Supreme Court’s earlier statement in Maryland v. Shatzer, 559 U.S. -, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), that “[n]o one questions that Shatzer was in custody for Miranda purposes.” Howes, 132 S.Ct. at 1188 (alteration in original). But the Court summarily rejected such a conclusion saying “[i]t strains credulity to read the statement as constituting an ‘unambiguous conclusion’ or ‘finding’ by this Court that Shatzer was in custody.” Id. Indeed, what White I actually said should be embraced by this court, not what it did not say.
Finally, Judge Loken contends that “[a] judicial candidate’s endorsement of a candidate for executive or legislative[32] office does more than indirectly announce the judicial candidate’s views on particular issues.” Ante at 1034. I agree. But, endorsements do, as Judge Loken concedes, very effectively announce ideas that are intended to benefit the judicial aspirant. Why this clearly constitutional “announce” capability should be stifled in favor of Judge Loken’s so-called judicial independence interest is not explained.
A judicial candidate’s endorsement of an executive or legislative candidate, as the Judge Colloton opinion cogently explains, usually benefits the endorsee more than the endorser. So, in that sense, any such endorsement makes quid pro quo bias in favor of or against anyone directly involved very unlikely.
I concede, however, that a judicial endorsement of a legislative or executive candidate may garner benefits for the judicial candidate, albeit in a remote and almost immeasurable way. The judicial candidate’s endorsement may favorably influence voters friendly to the endorsed candidate. If, for instance, the electorate favorably views the moral, intellectual, ethical, vocational, experiential or religious propensities of the candidate endorsed by the judicial candidate, it may redound to the benefit of the judicial aspirant. It may, on the other hand, redound to the endorsing candidate’s detriment. But, nonetheless, this is First Amendment protected electioneering activity that may only be limited by application of the narrow tailoring inquiry required by strict scrutiny. The question then becomes does this ambiguous and virtually immeasurable benefit somehow support the existence of a compelling state interest? I think not. At least, Appellees have not presented direct evidence (or any other evidence), as the Supreme Court requires, that the purported interest addresses a problem “in need of solving.” Brown, 131 S.Ct. at 2738. But, if it does, the regulation al *1050 most certainly fails the narrow tailoring test.
D. Narrow Tailoring
1. The Endorsement Clause
The endorsement clause prohibits a judicial candidate from “publicly endors[ing] or, except for the judge or candidate’s opponent, publicly oppos[ing] another candidate for public office.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(A)(3).[33] This restriction depends wholly upon the subject matter of the speech for its invocation. Candidates are not barred from talking about other candidates for any purpose other than endorsing or opposing them. “Restricting speech based on its subject matter triggers the same strict scrutiny as does restricting core political speech.” White II, 416 F.3d at 763-64.[34] As we noted in White II:
“[A] candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known [and associate with like-minded persons] so that the electorate may intelligently evaluate the candidates’ personal qualities and their positions on vital public issues before choosing among them on election day. Mr. Justice Brandéis’ observation that in our country public discussion is a political duty, applies with special force to candidates for public office.... [T]he First Amendment simply cannot tolerate [a] restriction upon the freedom of a candidate to speak [or associate] without legislative limit on behalf of his own candidacy.”
416 F.3d at 757 n. 8 (alterations in original) (quoting Buckley, 424 U.S. at 52-54, 96 S.Ct. 612). Thus, the endorsement clause burdens political expression because it impairs a candidate’s ability to vigorously advocate the election of other candidates whose success may also benefit the candidate, associate with like-minded candidates, and, thus, vigorously advocate his or her own campaign. Such a burden on political speech triggers strict scrutiny. Citizens United, 130 S.Ct. at 898; see also White II, 416 F.3d at 748-49.
a. Actual Bias
The notion of lack of actual bias “assures equal application of the law” because it “guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party.” White I, 536 U.S. at 776, 122 S.Ct. 2528. Thus, the question is whether the endorsement clause is narrowly tailored to meet this interest.
The Appellees contend that the endorsement clause is narrowly tailored to serve Minnesota’s compelling interest in impartiality articulated as a lack of bias for or against parties to a case. According to the Appellees, endorsements pose a particularly acute danger to impartiality defined as actual judicial bias because a public endorsement for a candidate may indicate a judicial candidate’s bias towards the endorsed party. Thus, argue the Appellees, *1051 the endorsement clause is, of necessity, a broadly applied constitutional evil designed to protect potential litigants from such a display of favoritism by the judicial candidate should he or she be elected. As a result, the blanket prohibition is needed to keep constitutional campaign speech from numerous citizens who will never be a “party to a proceeding” at all. I disagree. The Appellees’ endorsement clause is almost a perfect paradigm of overinclusiveness. It is also a perfect example of when recusal, as opposed to a blanket prohibition, is the necessary and appropriate remedy for actual bias or even the appearance of bias on the part of a judicial officer in an identifiable proceeding.
“The question under our strict scrutiny test ... is not whether the [endorsement] clause serves [the] interest at all, but whether it is narrowly tailored to serve [the particular] interest.” Id. at 777 n. 7, 122 S.Ct. 2528 (emphasis in original). The Appellees’ endorsement clause clearly fails this test.
Endorsing a well-known candidate is often a highly effective and efficient means of expressing one’s own views on issues. From one simple statement the judicial candidate can announce his or her own views on a myriad of matters. Furthermore, association with other like-minded candidates may well draw volunteers, votes and money from the endorsed candidate’s supporters and contributors. As earlier noted, Wersal sought to endorse and thus associate with Tim Tinglestad, candidate for Associate Justice of the Minnesota Supreme Court, Glen Jacobsen, candidate for Minnesota District Court Judge, and Michele Bachmann, candidate for United States Congress. The chances of any of these individuals, or others similarly situated, ever becoming a party in a proceeding in Wersal’s court, should he be elected, are between slim and none. And if, perchance, such a situation should occur, Appellees have a remedy in place, that is the disqualification rule, 2.11, in the Code of Judicial Conduct.[35]
The plurality, and the Seventh Circuit panel in Siefert, seem specifically troubled by the notion that a judicial candidate might endorse, for instance, candidates for sheriff and county attorney — persons who are likely to repeatedly appear as litigants or representatives of litigants in Minnesota courts, especially in smaller judicial districts or divisions in the state. But, the clause is not so cabined. It prohibits endorsements regardless of the likelihood that the endorsee will ever appear as a party in the state’s courts. Given that the state’s compelling interest in preserving an actual lack of bias extends only to preventing bias for or against a party to a proceeding, White I, 586 U.S. at 775, 122 S.Ct. 2528, the endorsement clause easily restricts more speech than necessary to serve that asserted interest. But, candidly, such conflicts do not arise only in the election context. Conflicts involving family members, former legal associates, business associates, personal investments or former political offices are continuously under consideration, usually through Rule 2.11. The prosecutor and sheriff are more likely examples of an excuse for, not a reason to create, First Amendment limitations.
*1052 If the Appellees’ endorsement clause is truly dedicated to the proposition that there should always be an actual or perceived unbiased judge in every proceeding, it is also almost wholly underinelusive. First, referring to Appellees’ concerns about the judicial candidate endorsing candidates for sheriff and county attorney. What if, on the other hand, these candidates or office holders endorse the judicial candidate? The clause only prevents, and could only prevent, a judicial candidate from endorsing other candidates for public office, not other candidates endorsing a judicial candidate. Yet the measure of judicial bias would be the same in the eyes of anyone not making or receiving an endorsement. Also, as earlier noted, a judicial candidate may endorse a public official or a potential candidate for office so long as the endorsee has not yet officially filed for office. Moreover, the endorsement clause does not prohibit a candidate from endorsing the acts and policies of other well-known non-candidates and organizations, no matter the likelihood of their becoming litigants in a case before the court — that is business organizations, labor unions, the American Civil Liberties Union or any public official not running for office at the same time as the judicial candidate.
Under the Appellees’ and plurality’s supposed standards, another important category of endorsements that could lead to actual bias or perceived bias by a party to a proceeding is left untouched. Lawyers and private citizens are not precluded from and often do, I believe, occupy publieally known positions on a judicial candidate’s committees — indeed committees are required by the Appellees’ rules. This participation is, at least, tacit endorsement of the judicial candidate and often involves public endorsements of one kind or another. The limitations placed upon judicial candidates by the endorsement clause fail to touch these sources of potential bias. Thus, the clause’s underinclusiveness belies its purported, but substantially ineffective, purpose of preserving impartiality defined as a lack of bias for parties to a proceeding or the appearance of bias by members of the general public.
Finally, as extensively alluded to earlier, a categorical ban on endorsements is not the least restrictive nor the most effective means of limiting bias for or against a party or appearance of such bias in a particular proceeding. Instead, where an individual or organization who receives a judge’s endorsement or campaign contribution appears before that judge, “recusal is the least restrictive [and best] means of accomplishing the state’s interest in impartiality articulated as a lack of bias for or against parties to the case.” White II, 416 F.3d at 755. In fact, “[t]hrough recusal, the same concerns of bias or the appearance of bias that Minnesota seeks to alleviate through the [endorsement] clause are thoroughly addressed without ‘burning] the house to roast the pig.’ ” Id. (third alternation in original) (quoting Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957)). That Rule 2.11 requires a judge to disqualify (recuse) “himself or herself in any proceeding in which the judge’s impartiality might reasonably be questioned,” is evidence of that fact. 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 2.11(A). And, “[c]oncern about the mere appearance [or possibility] of bias is also addressed by recusal.” White II, 416 F.3d at 755 (second alteration in original). This is because in Minnesota, “[t]he controlling [recusal] principle is that no judge ... ought ever to [hear] the cause of any citizen, even though he be entirely free from bias in fact, if circumstances have arisen which give a bona fide appearance of bias to litigants.” In re Collection of Delinquent Real Prop. Taxes, 530 N.W.2d 200, 206 (Minn.1995).
*1053 Accordingly, the endorsement clause is not narrowly tailored to serve any interest in electing unbiased judges and it is clearly not the least restrictive means of doing so. Thus, the clause fails strict scrutiny.
b. Perceived Bias
The endorsement clause when examined in the context of creating a “perception of the public concerning the judiciary’s lack of bias in a particular proceeding” is an even greater violation of the First Amendment than the “actual bias” clause.
The Appellees and the plurality offer nothing beyond unsupported speculation that the general public has any particular concern arising from a judicial candidate’s endorsement of another candidate for public office. And, because of the sheer breadth of the regulation in the context of a supposed perception of bias by the members of the general public arising from a judicial candidate’s endorsement or endorsements of other candidates for public office, this lack of evidence is crucial. While these evidentiary deficiencies track those discussed in my earlier evaluation of an actual bias interest, the endorsement clause’s application to this supposed public interest is even more pernicious and unnecessary.
Indeed, in the context of the public as a whole being shielded from a perception of bias by the offending endorsement prohibition, the overinclusiveness is almost beyond measurement. The clause actually advances no compelling interest, is overinclusive to the extreme and is by far the most restrictive available alternative for eliminating perceived bias, even if a compelling interest might be discernible.
If a compelling interest in shielding a potential party to a judicial proceeding from judicial bias arising from a judicial candidate’s endorsement of another candidate for public office actually exists, which is doubtful, the possibility of such accrual of such a perception of bias in the mind of a member of the general public is almost impossible. The chance that there is a member of the general public who (1) perceives the existence of a judge with a bias arising from the judge’s endorsement, as a judicial candidate, of another candidate for public office, and (2) then later observes a proceeding in which the endorsed candidate for public office becomes an adverse party in the court of the judicial candidate who has by then been elected to office, is, while not impossible, highly unlikely. Additionally, the possibility of that member of the general public ever becoming a party to such a proceeding is possibly akin to a person winning the national Powerball lottery on both Wednesday and Saturday for two or three successive weeks. This must be overbreadth.
And, even though I concede that under-inclusiveness need not be further discussed, the endorsement clause’s general prohibition, as written, is unnecessary in the extreme because Rule 2.11 is in place for the making of a judicial evaluation of disqualification if an analysis should become necessary. The perceived bias by the general public as argued by the Appellees and applied by the plurality runs to some broad concern for the equanimity, probity, and integrity of the court system as a whole, not from the possibility or probability of creating an actually favored party in a specific proceeding before a functioning judicial officer. The First Amendment rejects the plurality’s conclusion and so do I.
c. Judicial Independence
The endorsement clause restrictions are almost wholly untethered to the judicial independence interest advanced by the concurrence. Any real connection is not only almost imperceptible to the public but virtually immeasurable, at least by any *1054 means noted by the Appellees or the concurrence. Indeed, Judge Loken points to no showing by the Appellees that the simple act of endorsing another candidate for public office, especially another judicial candidate, which the clause also precludes, will directly (or even indirectly) undermine a sitting judge’s judicial independence.
Almost all of the narrow tailoring shortcomings of the endorsement clause in relation to the plurality’s purported “perceived bias” interest are applicable to this separately stated interest. But, the most serious flaw in the tailoring of the endorsement clause to this supposed interest is found in its overinclusiveness. Judge Lo-ken concedes that the endorsement of another candidate can be, and usually is, an announcement concerning issues deemed important by the candidate to the election contest. So, the endorsement clause clearly serves to preclude a campaign practice, announcing a candidate’s views, specifically validated by White I. Thus, it is not possible to narrowly tailor the clause even in the face of a recognizable state interest, especially one so vague, ambiguous and undefinable as one generally labeled judicial independence. Finally, the clause precludes endorsement of another judicial candidate even though Judge Loken does not include such an endorsement in his discussion of the perceived interest or explain how judicial independence might substantially be undermined if this were to occur.
The clause is unconstitutional when applied to Judge Loken’s interest, however compelling it might be.
2. Personal Solicitation Clause
Appellees’ contribution limitation regulations operate within the most fundamental area of First Amendment activity. Buckley, 424 U.S. at 14, 96 S.Ct. 612. “This is because virtually every means of [political] communicating ... requires the expenditure of money.” Id. at 19, 96 S.Ct. 612; see also White II, 416 F.3d at 764. Accordingly, there is no argument whatever from the Appellees and the plurality that Wersal’s solicitation of campaign funds is not fully protected by the First Amendment.
a. Actual Bias
The personal solicitation clause prohibits a judicial candidate (Wersal) from “personally soliciting] or accepting] campaign contributions other than as authorized by Rules 4.2 and 4.4.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(A)(6). This regulation is, of course, unconstitutional unless it passes strict scrutiny as applied to a bona fide compelling state interest. But, it does not so operate. To explain why, I begin with a precursor regulation imposed by the Appellees. “Canon 5 provides specifically that all [campaign] contributions are to be made [payable] to the candidate’s committee, and the committee ‘shall not’ disclose to the candidate those who either contributed or rebuffed a solicitation. 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 5, subd. B(2).” White II, 416 F.3d at 765. Thus, the underlying premise of personal solicitation Rule 4.1(A)(6) is that if the judicial candidate is armed with this “give or not give” contribution information, the “actual bias” concern identified by the plurality is triggered and the compelling state interest it embodies — actual bias — is violated by the candidate. Under the circumstances, say the Appellees and now the plurality, the otherwise constitutional electioneering activity represented by the personal solicitation of campaign funds by a judicial candidate may be forbidden to protect the compelling state interest. But, Caperton counsels to the contrary, unless “extraordinary” circumstances exist. 129 S.Ct. at 2265. And, Caperton also counsels that under such *1055 extraordinary circumstances, recusal is the appropriate remedy, not total prohibition of the personal solicitation of campaign funds. Id.
In Caperton, Justice Benjamin, the judicial officer involved, knew that Blankenship, Massey’s chairman, had made in excess of $3 million in contributions to his judicial campaign. The record does not disclose, but Benjamin may have personally solicited and received some of them, but whether he did or not is inconsequential to a constitutional analysis. The Supreme Court noted, “[n]ot every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge’s recusal.” Id. at 2263. And, as I will explain shortly, if recusal of an informed judge about a contribution is not required, prohibition of his personal solicitation of campaign funds cannot, in my view, be constitutionally required.
Numerous state court cases echo the Caperton premise. See Bissell v. Baumgardner, 236 S.W.3d 24, 29 (Ky.Ct.App. 2007) (“[A] judge is not required to disqualify himself or herself based solely on an allegation that a litigant or counsel for a litigant has made a legal campaign contribution to the political campaign of the trial judge.”); Adair v. State Dep’t of Educ., 474 Mich. 1027, 709 N.W.2d 567, 579 (2006) (“That a judge has at some time received a campaign contribution from a party, an attorney for a party, a law firm employing an attorney for a party, or a group having common interests with a party or an attorney, cannot reasonably require his or her disqualification.”); MacKenzie v. Super Kids Bargain Store, Inc., 565 So.2d 1332, 1335 (Fla.1990) (‘We conclude that an allegation in a motion that a litigant or counsel for a litigant has made a legal campaign contribution to the political campaign of the trial judge, or the trial judge’s spouse, without more, is not a legally sufficient ground.”). Storms v. Action Wisconsin Inc., 314 Wis.2d 510, 754 N.W.2d 480 (2008), perhaps says it most completely: “There is no case in Wisconsin or elsewhere that requires recusal of a judge or justice based solely on a contribution to a judicial campaign.” Id. at 487 (emphasis added) (quotation omitted). Neither have I found any such case. As explained in Caperton, it is truly axiomatic that no compelling state interest is served by a government prohibition of the knowing receipt and use of a campaign contribution when such receipt and use does not create, except in exceptional circumstances, a probability of judicial bias. Caperton, 129 S.Ct. at 2265. Indeed, one of Appellees’ amici, former Minnesota Supreme Court Chief Justice A.M. (Sandy) Keith has been heard to agree with this, assuming Minnesota press accounts are accurate. Keith said
he’d rather receive money from lawyers than from other sources.... [Tjhey understand the need for an independent judiciary and don’t expect anything in return. “There’s hardly a lawyer I know personally that I haven’t ruled against already in the 3/6 years I’ve been on the court.... They know how the system works, that you don’t come up here and win ’em just because you know somebody on the court.”
Associated Press.
Thus, there is nothing extraordinary about Wersal receiving a personally solicited contribution to his campaign within the legal limits prescribed by Minnesota law and duly reported as required by state statute. But if anything extraordinary is found, as in Caperton, recusal is the only “necessary” remedy. And, the falderal from the Appellees about how “unhandy” recusal may be in such cases is frivolous and must yield to the First Amendment protections that have repeatedly been pointed out in White I, White II, and other precedent cited in this dissent.
*1056 Finally, in this case there is even less cause to validate Rule 4.1(A)(6)’s prohibition. Wersal has, out of an abundance of caution, agreed to voluntarily disqualify himself in any case in which he acquires knowledge of the identity of a personally solicited campaign contributor.
In sum, a compelling state interest cannot emerge from campaign activity that does not produce the probability of judicial bias, and without a compelling state interest at work, government regulation of constitutionally protected election activity is, itself, unconstitutional. So, after Caperton, it seems unusual that the Appellees, on their own motion, would not have set about dismantling Rule 4.1(A)(6) as unnecessary.
b. Perceived Bias
As with the candidate endorsement clause, Appellees have made no showing that any member of the general public has or will in the future perceive judicial bias arising from the constitutional act of soliciting and receiving an election campaign contribution. Again, as with candidate endorsements, a perceived bias developed by a citizen who is only peripherally involved in either the judicial election or the judicial process and is only remotely likely to become a party in a proceeding presided over by a particular judicial candidate should he or she be elected to office, is difficult, if not almost impossible, to comprehend. But, such is the stuff of the plurality’s vaguely presented premise based upon absent proof of a reasonably defined “perception of bias” which in turn, responds to a compelling state interest.
3. Solicitation for a Political Organization or Candidate
A judicial candidate shall not “solicit funds for a political organization or a candidate for public office.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1(4)(a). The plurality, through a faulty “ripeness” analysis, avoids any attempt to either explain or validate this limitation on Wersal’s constitutionally protected judicial election activity. Accordingly, in turn, I do not address the Rule in detail. For the reasons outlined above in conjunction with the endorsement and personal solicitation clauses, activity prohibited by this rule clearly is protected by the Constitution. Indeed, soliciting campaign contributions for an endorsed candidate for public office would usually be, at least, simply an added form of endorsement. So whether evaluated for connection with a court-opinion-defined “compelling state interest” of either “actual bias” or “perceived bias,” the Rule is unconstitutional.
III. CONCLUSION
As Justice O’Connor said in White /:
Minnesota has chosen to select its judges through contested popular elections instead of through an appointment system or a combined appointment and retention election system along the lines of the Missouri Plan. In doing so the State has voluntarily taken on the risks to judicial bias described above. As a result, the State’s claim that it needs to significantly restrict judges’ speech in order to protect judicial impartiality is particularly troubling. If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.
536 U.S. at 792, 122 S.Ct. 2528 (O’Connor, J., concurring).
In sum, as stated in the beginning, the Appellees’ limitations are unconstitutional and must be enjoined. Accordingly, I dissent.

. Among its several contentions in support of its various rules and regulations, Appellees assert a "separation of powers” claim based upon Article III, section 1 of the Minnesota Constitution. Appellees' expositions in this regard are designed to advance a compelling state interest in judicial independence. The citizens of Minnesota have actually provided scant constitutional and statutory support for such an argument.
Article III, section 1 states:
The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution.
Minn. Const. art 3, § 1 (emphasis added).
While the Article mentions a distinct "judicial” department with "powers properly belonging” to it, the final clause of the Article limits judicial powers as "expressly provided in [its] constitution.” And, for the Minnesota judicial branch, the limitations are numerous. As the saying goes, for the Appellees "the devil is in the details.” In addition to the legislature's involvement with and control of the form of the judicial ballot, there are a plethora of other direct and indirect controls over the on-going operations of the Minnesota judicial system. The partisanly elected chief executive of state government has, since at least 1972, intimately involved himself injudicial selection and retention. The governor appoints a lawyer to fill a judicial vacancy and the appointee stands for election "at the next general election occurring more than one year after the appointment.” Peterson, 490 N.W.2d at 423 (quotation omitted). As also noted, it has been standard practice for incumbent judges to vacate a judicial office shortly before the end of a term, allowing the executive-friendly appointee (more often than not a member of the governor’s political party) to run as the "incumbent” at the next general election. This practice has resulted in the election of only one non-gubernatorial appointee to judicial office on the Minnesota Supreme Court in at least the last thirty years.
Likewise, the Minnesota Supreme Court promulgates the canons of judicial conduct at issue in this litigation at the direction of the Minnesota legislature who, in turn, may alter the ultimate work product produced. Minn. Stat. Ann. §§ 480.05, 480.058. The legislature also determines, with minor exceptions, the boundaries of many judicial districts. Id. § 2.722. The legislature establishes the schedule of fees and costs chargeable by Minnesota courts and dictates that such fees be placed in the general fund for the legislature’s ultimate appropriation. Id. §§ 357.021, 357.08. The legislature validates rules of procedure and rules of evidence to be used in the Minnesota courts, id. §§ 480.058, 480.0591(6); sets judicial pay for judges, Minn. Const. art. 6, § 5; appropriates the operational budgets of the courts and controls the financing and building of court facilities, Minn.Stat. Ann. § 10.44.

. As I noted in my dissent in Republican Party of Minnesota v. Kelly, 247 F.3d 854, 896 (8th Cir.2001), in the 2000 judicial elections, the four supreme court justices seeking reelection raised a combined $505,070.63. Of their opponents, only two raised sufficient funds to even warrant disclosure under the legislature’s reporting rules. The two together, however, raised only $23,582.67.

. As I understand the posture of this case after examining the salmagundi of court opinions, there is a majority of judges of the en banc court who agree with two concepts: that the Rule 4.1(A)(4) (soliciting funds for a political organization) issue is not ripe for review, and that the personal solicitation clause in Rule 4.1(A)(6) is constitutional on the grounds that it is narrowly tailored to serve the compelling state interest of "actual impartiality.” Four members of the en banc court agree with Judge Bye’s opinion that the "appearance of impartiality” is also a compelling state interest, and that Rule 4.1(A)(3)’s endorsement clause is constitutional because it is narrowly tailored to serve both impartiality interests. Two members of the court, as stated in Judge Loken’s opinion concurring in the judgment, believe the endorsement clause is constitutional only on the basis of the Appellees' asserted compelling interest in the political independence of its judiciary. Accordingly, for ease of reference only, I will refer to the opinion authored by Judge Bye as the "plurality,” and the opinion authored by Judge Loken as the "concurrence.” Where necessary, I refer to Judge Colloton’s separate dissent as the "Judge Colloton opinion.”

. The Code defines "judicial candidate” as "any person, including a sitting judge, who is seeking selection for judicial office by election or appointment.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Terminology.

. Notably, Canon 4 applies to both judicial candidates and to non-candidate judges. See 52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 4.1. I review the constitutionality of these clauses only as they apply to judicial candidates.

. These clauses are subject to certain other requirements and exceptions listed in Rules 4.2 and 4.4 of the Code. 52 Minn. Stat. Ann., Code of Judicial Conduct, Rules 4.2(A)(5), B(3) & 4.4(B)(1).

. Wersal's personal solicitation is, in and of itself, core political speech. White II, 416 F.3d at 764. “This is because the [restrictive solicitation] clause applies to requests for funds to be used in promoting a political message.... And promoting a political message requires the expenditure of funds.” White II, 416 F.3d at 764.
[V]irtually every means of communicating ideas in today’s mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate’s increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.
Buckley v. Valeo, 424 U.S. 1, 19, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).

. "Minnesota may choose to have an elected judiciary. It may strive to define those characteristics that exemplify judicial excellence. It may enshrine its definitions in a code of judicial conduct. It may adopt recusal standards more rigorous than due process requires, and censor judges who violate these standards. What Minnesota may not do, however, is censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer. Deciding the relevance of candidate speech is the right of the voters, not the State.” White I, 536 U.S. at 795, 122 S.Ct. 2528 (Kennedy, J., concurring) (emphasis added).

. The concurrence agrees with the plurality’s restriction of Wersal's core political speech through limitations placed upon his personal solicitation of funds to conduct an election campaign. Judge Loken, apparently discerning “a proper level of strict scrutiny,” advances problematic and unsupportable theories. He states that the restriction passes strict scrutiny "[bjecause Rules 4.2 and 4.4 [embracing Appellees' campaign committee fund-raising scheme] allow all judicial candidates adequate opportunity to fund their campaigns.” Ante at 1033 (emphasis added). ■This contention is squarely at odds with Supreme Court precedent.
[T]he notion that the special context of electioneering justifies an abridgment of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head.... It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign. We have never allowed the government to prohibit candi *1040 dates from communicating relevant information to voters during an election.
White I, 536 U.S. at 781-82, 122 S.Ct. 2528 (internal quotation and citation omitted).
Judge Loken's proposed substitution of Rules 4.2 and 4.4 for Wersal's acts of personal solicitation of campaign funds unconstitutionally validates just such a government prohibition. Likewise, Judge Loken’s reference to “a proper level of strict scrutiny” through this limitation on campaign speech illuminates the failure of Appellees to bear their burdens of proof and persuasion on the solicitation issue — that is, have Appellees satisfied strict scrutiny (as defined and applied by the Supreme Court in White I) or not? See Brown v. Entm’t Merch. Ass’n, - U.S. -, 131 S.Ct. 2729, 2738-39, 180 L.Ed.2d 708 (2011) (noting that the government must show a “direct causal link” between its regulation and the purported harm it seeks to avoid and that the state “bears the risk of uncertainty” and "ambiguous proof will not suffice”).

. " 'If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process ... the First Amendment rights that attach to their roles.' " White I, 536 U.S. at 788, 122 S.Ct. 2528 (alteration in original) (quoting Renne v. Geary, 501 U.S. 312, 349, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (Marshall, J., dissenting)).

. While arriving at the correct conclusion, the plurality cites Siefert v. Alexander, 608 F.3d 974 (7th Cir.2010), cert. denied, - U.S. -, 131 S.Ct. 2872, 179 L.Ed.2d 1203 (2011), in an apparent attempt to mitigate the requiring of strict scrutiny in this case. In Siefert v. Alexander, a split panel of the Seventh Circuit (whose decision led to a published dissent to the denial of rehearing en banc signed by four judges, 619 F.3d 776 (7th Cir.2010)) misreads or disregards several of the mandates of White I. After doing so, the Siefert panel, advancing a difference without a distinction, classifies two types of election speech into categories of greater and lesser importance, contrary to well established judicial precedent. Then, importing Supreme Court cases regulating public employee speech balanced against the efficient operations of government employers into the mix, the panel arrives at a relaxed scrutiny analysis of First Amendment protected speech. 608 F.3d at 985.

. A French term meaning reason or justification for existence.

. The same also applies to the requirements of 28 U.S.C. § 455, the federal courts disqualification statute.

. See Ante n. 23.

. Mr. Hamilton's quote from The Examination was uttered in defense of the judicial Article in the United States Constitution when *1049 the Article was under attack in 1802. I suspect a very high percentage of the judicial officers of the United States would vocally support and prefer a judicial appointment with life tenure upon good behavior such as Hamilton was defending. But, no involvement of a judicial election with First Amendment protections was at issue at the time.

. Judge Loken says nothing about the endorsement of the judicial candidates Wersal wished to make, a matter I will later discuss.

. Wersal only challenges the "endorsement” provision of the clause.

. Appellees argue that endorsements are not necessary to run an effective campaign. Such an inquiry, however, is irrelevant as to whether restricting endorsements burdens core political speech. Instead, the inquiry is whether the infringed expression would communicate relevant information to the electorate. See White I, 536 U.S. at 782, 122 S.Ct. 2528 ("We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.”).

. Rule 2.11(A)(1) provides:
(A) A judge shall disqualify himself or herself in any proceeding in which the judge’s impartiality might reasonably be questioned, including but not limited to the following circumstances:
(1) The judge has a personal bias or prejudice concerning a party or a party’s lawyer, or personal knowledge of facts that are in dispute in the proceeding.
52 Minn. Stat. Ann., Code of Judicial Conduct, Rule 2.11(A)(1).